#14660127037

1

IN THE UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF

OHIO

FILED

OCT 2 9 2020

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

1:20 CV 2455

JUDGE BARKER

MAG. JUDGE GREENBERG

ALYCIA A. TAYLOR

    Plaintiff,

v.

UNIVERSITY HOSPITALS OF CLEVELAND
INC.OH, 11100 Euclid Avenue Cleveland, OH 44106,
UNIVERSITY HOSPITAL MACDONALD
WOMEN'S HOSPITAL, INC., 8900 Darrow Road
Suite H112 Twinsburg, OH, 44087, JOSEPH SHAWI,
M.D., J. BOYD, M.D., DANIEL RZEPKA,
M.D.,official capacity, individual capacity
UNIVERSITY HOSPITAL HEALTH SYSTEM,
BEDFORD MEDICAL CENTER, INC., BEDFORD,
OH 44146

Mayo Clinic and Mayo Clinic Laboratories, 200
First street SW Rochester, MN 55905, Gina K.
Hesley, MD Tiffany M. Sae Kho, M.D. Pruthi,
Sandhya, M.D., Jane Doe #1- Ultrasound
technician, Daniela L. Stan, M.D., official
capacity, and individual capacity

South Suburban Women's Center 9105 Darrow
Rd #1821, Twinsburg, OH 44087, John J.
Farinacci, D.O., Jane Doe #2-Ultrasound
Technician, official capacity and individual
capacity dba University Hospital (Parma)
Systems of Cleveland, OH 44129

Cleveland Clinic, 9500 Euclid Avenue Cleveland,
OH 44195, Paulette Turk (Lebda) M.D., Kristina
Shaffer, M.D., capacity and individual capacity.
Cleveland Clinic South Pointe Hospital and
Cleveland Clinic Laboratory ,20000 Harvard Ave,
Beachwood, OH 44122, Samir Abraksia M.D.,
Renee Keglovic, Echo Technician, official
capacity, and individual capacity Defendants.

Case No.:

JUDGE

COMPLAINT:
Negligence – **Medical
Malpractice**

JURY DEMAND ENDORSED

HEREON

has **NOW COMES PLAINTIFF, ALYCIA A. TAYLOR (PRO SE)**, who submits this complaint, "A pro se pleading must be liberally construed and "held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976))" Gant v. Neely, NO. 3:19-cv-0387, 2 (M.D. Tenn. May. 31, 2019) he federal courts of appeals have liberally construed the technical requirements for a notice of appeal contained in Fed. R. App. P. 3(c). E.g., Campbell v. Wainwright, 726 F.2d 702, 704 (11th Cir. 1984); see Higginson v. United States, 384 F.2d 504, 508 (6th Cir. 1967) (per curiam) (construing a corresponding provision in former Fed. R. Civ. P. 73(b)), cert. denied, 390 U.S. 947, 88 S. Ct. 1034, 19 L. Ed. 2d 1137 (1968). The courts have consistently stated that failure to mention or misidentification of the ruling being appealed from does not destroy appellate jurisdiction as long as the intent to appeal is apparent and the appellee suffers no prejudice. E.g., Litchfield v. Spielberg, 736 F.2d 1352, 1355 (9th Cir. 1984), cert. denied, 470 U.S. 1052, 105 S. Ct. 1753, 84 L. Ed. 2d 817 (1985); Campbell, 726 F.2d at 704; C.A. May Marine Supply Co. v. Brunswick Corp., 649 F.2d 1049, 1056 (5th Cir.), cert. denied, 454 U.S. 1125, 102 S. Ct. 974, 71 L. Ed. 2d 112 (1981); Peabody Coal Co. v. Local Union Nos. 1734, 1508 & 1548, U.M.W., 484 F.2d 78, 81 (6th Cir. 1973). In addition, courts have been especially reluctant to enforce strictly the notice of appeal requirements when such notice is filed by a pro

se appellant. to appeal, filed within the ten-day period, even though it may omit some of the prescribed elements."); cf. Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 595, 30 L. Ed. 2d 652 (1972) (per curiam) (pro se complaints liberally construed). Plaintiff claims are sufficient to withstand motion to dismiss [12(b)(6)] or motion for judgment on the pleadings [12(c)] the law requires accepting the allegations of fact herein this complaint as true (but not accepting legal conclusions) the claim has "facial plausibility." That is, this court is able to draw "the reasonable inference that the defendants are liable for the misconduct alleged." *Iqbar, 556 U.S. at 678, 129 S.Ct. at 1949, 173 L. Ed. 2d at 884. See also Twombly 550 U.S. 570, 127 S. Ct. 1974, 167 L. Ed 2d 949 (2007)*. (The Plaintiff has alleged enough by way of factual [not legal] content to "nudge" her claim "across the line from conceivable to "plausible").

In *Picking v. Pennsylvania Railway, (151 F2d. 240)*, the Third Circuit Court of Appeals held that, 'Where a plaintiff pleads pro-se in a suit for protection of civil rights, the court should endeavor to construe plaintiffs pleading without regard to technicalities.'"

"In *Puckett v. Cox*, it was held that a pro-se complaint requires a less stringent reading than one drafted by a lawyer (*456 F2d 233 (1972 Sixth Circuit USCA*) said Justice Black in *Conley v. Gibson. 355 U.S. 41 at 48(1957)* 'The Federal Rules rejects the approach that pleading is a game of skill in which one misstep by

counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits.' and 'According to rule 8(f) FRCP all pleadings shall be construed to do substantial justice.'"

## STATEMENT OF FACTS

1.1 The Plaintiff is a resident of Summit County, Ohio at 240 Eaton Ridge #103 Sagamore Hills, OH 44067.

1.2 This is an action for a declaratory judgment, preliminary and permanent injunctive relief, legal and equitable relief, and damages for Defendants UNIVERSITY HOSPITALS OF CLEVELAND, INC., OH, 11100 Euclid Avenue Cleveland, OH 44106, UNIVERSITY HOSPITAL MACDONALD WOMEN'S HOSPITAL, INC. 8900 Darrow Road Suite H112 Twinsburg, OH, 44087, JOSEPH SHAWI, M.D., J. BOYD, M.D., DANIEL RZEPKA, M.D., official capacity and individual capacity UNIVERSITY HOSPITAL HEALTH SYSTEM, BEDFORD MEDICAL CENTER, INC., BEDFORD, OH 44146, UNIVERSITY HOSPITALS,  official capacity and individual capacity providing medical services to the citizens and has its principal place of business located in Cleveland, Bedford, and Twinsburg, Ohio.

1.3 That Defendant UNIVERSITY HOSPITAL CLEVELAND MEDICAL

CENTER, Inc. is an OHIO Corporation providing medical care to the citizens of

the State of OHIO with its principal place of business located at 11100 Euclid

Avenue, City, Cleveland, Ohio and is wholly owned by Defendant UNIVERSITY

HOSPITAL CLEVELAND MEDICAL CENTER, Inc.

1.4 The defendant's wrongful actions and inactions stemming from Plaintiff

ALYCIA A. TAYLOR   pro se, ("Taylor's). The defendants failed to properly treat

Alycia in accordance with the standard of care for physicians specializing in

Obstetrics and Gynecology and Urology. The Defendants consistently engaged in

an ongoing fraudulent narrative, purposeful concealing plaintiff's medical status

and treatments performed by them. The medical negligence, fraudulent

concealment, and inaction and inactions violated the plaintiff's constitutional rights

and breached the standard of care that each physician is required to administer. The

actions caused severe harm to the plaintiff requiring repeated surgical procedures,

ongoing severe physical symptoms( chronic abdominal and pelvic pain – chronic

and debilitating right flank , irregular bleeding, incontinence, constipation, fatigue,

back, leg, and feet pain, painful chronic cramping, breast pain, severe headaches,

chronic eye, tongue,  and jaw pain and facial droop/disfiguration, mental and

emotional stress, and the defendants deliberately eliminated the plaintiff out of her

constitutional right to bodily integrity and personal autonomy by their ongoing non-disclosures of her healthcare status and diagnoses.

1.5 That defendants are medical providers providing medical services in Ohio and at the time of the alleged medical malpractice were all employees/agents/servants of Defendants UNIVERSITY HOSPITALS OF CLEVELAND INC. OH, 11100 Euclid Avenue Cleveland, OH.  and were acting within the scope of that employment/agency/servant relationship when they failed to follow the applicable standard of medical care during their treatment of the Plaintiff on or about February 5, 1999, and many times thereafter, until 2019 at University Hospitals Health System, Bedford Medical Center, Bedford, Ohio 44146, which proximately resulted in a physical injury to the Plaintiff. However, it was just recently discovered on or about the end of May or early part of June of 2019.

1.6  This action for a declaratory judgment, preliminary and permanent injunctive relief legal and equitable relief, and damages for Defendants South Suburban Women's Center 9105 Darrow Rd #1821, Twinsburg, OH 44087, JOHN J. FARINACCI, D.O., and Jane Doe #2 dba University Hospital Systems (Parma) Medical Center, 7007 Powers Blvd, Parma, OH 44129, official capacity and individual capacity wrongful actions and inactions and failing to properly treat Alycia Taylor and give special attention to Mrs. Taylor's continued abdominal pain and medical history which included pertinent medical data for follow up

treatments. The plaintiff believed she was obtaining a second opinion from the defendant acting in his official capacity at South Suburban Women's

Center 9105 Darrow Rd #1821 Twinsburg, OH 44087. However, because of the breach standard of care the defendant's negligence, defamatory remarks, and false statements he stepped outside of his scope as an employee of South Suburban Women's Center. Additionally, the defendant misrepresented himself as an employee of the UNIVERSITY HOSPITAL SYSTEMS OF PARMA OH by wearing a Doctor's long white jacket that had University Hospital identification/logo, which he alleged was "just lying around." **SEE EXHIBIT (#1)** PHOTO of defendant in UNIVERSITY HOSPITAL WHITE PHYSICIANS LAB COAT. The defendant provided the plaintiff with a MAMMOGRAM requisition on UNIVERSITY HOSPITAL Parma prescription stationery also **SEE EXHIBIT (#2),** FAIRNACCI maintained his position that he was a SOUTH SUBUURBAN WOMEN'S CENTER PHYSICIAN. The plaintiff attempted to obtain the Mammogram at the defendant's South Suburban Women's Center parking lot, Twinsburg, OH location around late July 2019 from the Mercy Mobile Mammogram Bus. The technicians refused to perform the Mammogram reporting to the plaintiff this was NOT DR. FAIRNACCI'S requisition. Jane Doe #2 further breached the standard of care by demanding the plaintiff "insert the Ultrasound wand into her own vagina" as an act to humiliate and derail the plaintiff's

treatment in the presences of her spouse. The defendant's request was deliberately intended to disrespect and demean the plaintiff, especially with the Jane Doe #2 Ultrasound Technician aware that the plaintiff was not a Certified Ultrasound Technician or licensed medical professional that was qualified to operate the Ultrasound equipment. The defendant deliberately breached the standard of care by demanding the plaintiff to perform a component of the ULTRASOUND IMAGING she was untrained to do and out of her scope as a patient/plaintiff. This intentional act of malice and disrespect inflicted a large measure of emotional distress, anguish, and embarrassment for the plaintiff and her spouse.

1.7 This action also includes declaratory judgment, preliminary and permanent injunctive relief, legal and equitable relief, and damages for Defendants MAYO CLINIC and MAYO CLINIC LABORATORIES 200 First Street SW Rochester, Minnesota 55905, GINA K. HESLEY M.D., TIFFANY M. SAE KHO M.D., SANDHYA PRUTHI, M.D. DANIELA L. STAN M.D., and JANE DOE #1 (ULTRASOUND TECHNICIAN) official capacity and individual capacity MAYO CLINIC and MAYO CLINIC LABORATORIES 200 First Street SW Rochester, Minnesota 55905 providing medical services to the citizens and has its principal place of business located in Rochester, Minnesota 55905, demonstrating Diversity of Citizenship; pursuant to 28U.S.C. § 1332 the defendants were acting within the scope of that employment/agency/servant relationship when they failed to follow

the applicable standard of medical care during their treatment of the plaintiff on September 26 & 27 2019. The defendants violated the plaintiff's constitutional rights of bodily integrity and personal autonomy by their NON-DISCLOSURE of a change (mass) in the plaintiff's right breast from an "INCIDENTALLY FOCUSED ULTRASOUND…" and PARANEOPLASTIC AUTOANTIBODY EVALUATION SERUM (Test to detect CANCER, according to MAYO CLINIC LABORATORY). The plaintiff became aware of the newly observed change in the plaintiff's right breast only after requesting and reviewing her own medical record from MAYO CLINIC (January 2020). The plaintiff contacted the MAYO CLINIC immediately to obtain an explanation about the NON-DISLOSURE and how this change in her right breast was linked to the partial disclosures the above defendants provided her during the September 26 & 27 2019 consultation and testing. These attempts were unsuccessful; the defendants resisted any direct conversation revolving around the omission of the "INCIDENTIALLY FOCUSED ULTRASOUND in the right subareolar breast at 7:00. Which demonstrates a BENIGN-APPEARING ectatic dilated duct with 4mm cyst. No suspicious findings." The plaintiff made several direct attempts via phone and written correspondence requesting further consultation regarding the new finding **SEE EXHIBIT (#3).** The defendants failed to discuss any of plaintiffs concerns and followed up with an AMENDED DOCUMENT that failed to address the plaintiff's

pointed demand for disclosure and transparency regarding the newly observed

4mm cyst in dilated right breast duct **SEE EXHIBIT (#4)** which identifies the

INCIDENTALLY FOCUSED ULTRASOUND, but fails to explain the motive for

the NON -DISCLOURE or it's connection to the plaintiff's other risk factors and

breast health determined by the defendants on September 26 &27, 2019 . The

plaintiff was distressed, especially considering the other factors from the

September 26 &27 2019 breast consultations when the defendants determined the

plaintiff had an alleviated risk of breast cancer. Moreover, the defendants were in

possession of PARANEOPLASTIC AUTOANTIBODY EVALUATION SERUM,

that is a directly focused CANCER test that was performed February 2016 from

plaintiff 's specimen **SEE EXHIBIT (#5).** The plaintiff was unaware of any new

changes in her right breast or that her bloodwork had been evaluated at Mayo

Clinic to detect CANCER. The plaintiff did not receive the appropriate treatment,

standard of care was breached, and her constitutional rights were violated. Most

importantly the above acts denied the plaintiff an opportunity to seek immediate

care based on a truthful narrative and objective, factual medical data that the

defendants were aware of and determined however, to omit, misrepresent, and

conceal from plaintiff. The defendants' actions and inactions created further delay

in plaintiff seeking subsequent medical attention. The plaintiff continued to

experience chronic right rib and right breast pain, along with an outbreak of

blisters on her right breast. These conditions caused the plaintiff to seek medical

care and supplemental testing (MRI and MBI) the defendant proposed as an option,

despite the defendant, SANDHYA PRUTHI's hesitancy related to the high cost of

testing.

1.8 This action also includes declaratory judgment, preliminary and permanent

injunctive relief, legal and equitable relief, and damages for Defendants

CLEVELAND CLINIC and CLEVELAND CLINIC LABORATORY, 9500

Euclid AVE. Cleveland, OH, 44195, CLEVELAND CLINIC SOUTH POINTE

HOSPITAL 20000 Harvard Ave., Beachwood, OH 44122, SAMIR ABRAKSIA

M.D., RENEE KEGLOVIC-ECHO TECHNICIAN, PAULETTE TURK (LEBDA)

M.D., KRISTINA SHAFFER M.D. official capacity and individual capacity. The

defendants were acting within the scope of that employment/agency/servant

relationship when they failed to follow the applicable standard of medical care

during their treatment of the plaintiff on June 30, 2020 and July 14 and 17, 2020.

The defendants have breached the standard of care, by deliberately misrepresenting

the plaintiff's medical data to allege a pre-planned medical narrative and diagnosis,

which the Defendant SAMIR ABRAKSIA intentionally failed to disclose medical

data during the plaintiff's Hematology/Oncology consultation on June 30, 2019.

ABRAKSIA alleged he did not have a requisition from the plaintiff's primary care

physician, ERIN M. HILLARD D.O. which contained a request for Complete

Blood Count including a WHITE BLOOD COUNT. The defendant alleged this prevented him from evaluating the diagnosis D70.69 -NEUTROPENIA on the requisition. The defendant explained to the plaintiff and her spouse that he could not view or access to the Complete Blood Count Report from the bloodwork performed at CLEVELAND CLINIC SOUTH POINTE HOSPITAL LABORATORY on June 26, 2020. This was a blatant lie. THE plaintiff obtained her medical records August 2020 the defendant viewed, evaluated, reported, documented, and authored a diagnosis during the time of the office visit. **SEE EXHIBIT (#6)** which demonstrated the time the physician viewed and evaluated the Complete Blood Count test results and provided a Diagnoses as follows: Malaise and Fatigue Primary, and Neutropenia Unspecified Type (HCC) on June 30, 2020 during the plaintiff's office visit. The defendant deliberately underreported the plaintiff's chronic symptoms she described and reported symptoms inaccurately and very vaguely, even after the plaintiff clarified the symptoms repeatedly. The defendant intentionally misrepresented the plaintiff's factual medical data. The defendant engaged in this misleading behavior consistently throughout the consultation and following the visit. The defendant offered to perform a second Complete Blood Count Test and Differential and contact the plaintiff via phone if there were any questionable bloodwork results. The bloodwork test was performed on June 30, 2020 by his Medical Assistant,

Tamar. ABRASKIA, constructed this plan so he could evaluate the plaintiff's

bloodwork he denied ever accessing. The defendant acted contrary to his plan, he

discontinued his newly ordered Complete Blood Count test from June 30, 2020

minutes after the blood was drawn. **SEE EXHIBIT (#7)** He omitted the name of

the individual who withdrew plaintiff's blood, and he did not contact the plaintiff

by phone. He did however, noted the above diagnosis in the medical record **SEE**

**EXHIBIT (#8) diagnosis,** but failed to disclose any information to the plaintiff.

The defendant noted he would communicate with the plaintiff's primary care

physician by mail, email, or phone. The plaintiff followed up with her primary care

physician on July 23, 2020 and received a copy of the documentation provided by

ABRASKIA which only contained the blood results **SEE EXHIBIT (#9)** it did not

contain any diagnoses or data he had provided in the plaintiff's medical record.

The defendant has committed numerous deceitful, fraudulent, and breached the

standard of care repeatedly. He admitted to the plaintiff he was not truthful during

the consultation after the plaintiff communicated in person, by letter, and phone to

the CLEVELAND CLINIC OMBUDSMAN'S OFFICE of the egregious behaviors

**SEE EXHIBIT (#10)** letter alerting the CLEVELAND CLININC'S PRESIDENT,

TOMISLAV MIHALJEVIC, OMBUDSMAN, TRISHA and the DIVERSITY and

INCLUSION ADMINISTRATOR of the DEFENDANTS actions. The plaintiff's

health care has become a accumulation of NON-DISCLOSURES,

MISREPRESENTATIONS, DELIBERATE OMISSIONS of TRUTHFU

OBJECTIVE MEDICAL DATA, and EGREGIOUS and HOSTILE ACTS towards

the plaintiff by their continued breach of standard of care, violation of plaintiff's

Constitutional Rights of Personal Autonomy and Bodily Integrity and poor and

inappropriate treatments.

On July 17, 2020 Defendants, PAULETTE TURK (LEBDA) and KRISTINA

SHAFFER manipulated a series of pre-planned acts to reconstruct the plaintiff's

OVERALL BREAST HEALTH STATUS. The plaintiff sought MRI OR MBI

testing from recommendation of a September 27, 2020 MAYO CLINIC BREAST

CLINIC, ROCHESTER MINNESOTA and her PRIMARY CARE PHYSICIAN as

an option to help further determine the status of my right breast health **SEE**

**EXHIBIT (#11).** Defendant PAULETTE TURK(LEBDA) alleged the images and

reports on plaintiff's CD's that she brought from MAYO CLINIC September

26&27 2020 and UNVERSITY HOSPITAL BEDFORD OH, DECEMBER 2018

were not on the disc. The defendant alleged the CD's contained reports from an

AKRON HOSPITAL, which the plaintiff had never visited or received any testing

or examinations. After the mix, up and intervention from a manager, the defendant

was able to access the plaintiff's images and reports. But she led the plaintiff to

believe it would be best to repeat the MAMMOGRAM TEST despite having the

September 26 & 27 2020 MAYO CLINIC test results. Defendant TURK also

determined she required further testing and performed a LIMITED RIGHT

BREAST ULTRASOUND **SEE EXHIBIT (#12).** The defendant produced several

reports with Amendments, the reports contained ambiguous data and were

conflicting with the medical data she pointed out and explained to plaintiff during

the imaging/consultation. The defendant described the plaintiff's right breast as

"everything looked or correlated with MAYO'S findings." TURK(LEBDA),

referred to the MAYO's INCIDENTALLY FOCUSED ULTRASOUND 4mm

BEGING APPEARING CYST IN THE PLAINTIFF'S RIGHT SUBOLEAR

BREAST as a "BLACK HOLE," that she pointed out to the plaintiff on the screen.

TURK went further by explaining there were no issues. The defendant reported

several unclear, blurred, and slanted interpretations of the report she produced. The

language which the defendant utilized identified features in both plaintiff's breast

consisting of "FIBRO SCATTERED ELEMENTS" which she alleged was

comparable to the December 5, 2018 UNIVERSITY HOSPITAL IMAGES and

REPORT. The defendant misrepresented her report by inferring that her

observation and mention of the fibro glandular scattered elements in the plaintiff's

breast were categorized/quantified as #2 when #4 category also consist of fibrous

tissues.

AMERICAN CANCER SOCIETY (2020) reported, "There are 4 categories

of breast density. They go from almost all fatty tissue to extremely dense

tissue with very little fat the radiologist decides which of the 4 categories

best describes how dense your breast are: 1). Breast are almost all fatty

tissue. 2) There are scattered areas of dense glandular and fibrous tissue. 3)

More of the breast is made of dense glandular and fibrous tissue (described

as **HETEROGENEOUSLY DENSE**). 4) Breasts are **extremely dense**

scattered tissue.

 The UNIVERSITY HOSPITAL Radiologist REPORT concluded and documented

the plaintiff's breast were HETERGENOUSLY DENSE, **SEE EXHIBIT (#13).**

The defendant used ambiguous language and did not directly quantify the

plaintiff's BREAST DENSITY CATEGORY, but rather pointed out the elements

of fibro glandular scattered tissue in both breasts. Heterogeneously Dense Breast

are comprised of a higher amount of the fibro glandular tissue. The defendant

generated a slanted report to persuade readers to believe the breast were quantified

as Scattered areas of dense glandular and fibrous tissue, a reduced category,

instead of HETERGENOUSLY DENSE. The Defendant avoided referring to the

more recent September 26 &27, 2019 MAYO CLINIC report relating to plaintiff's

breast density, which demonstrated the plaintiff's breast were quantified as

HETEROGENEOUSLY DENSE: C. The defendant incorporated this well devised

plan to carry out the most egregious step in TURK (LEBDA)'S and Defendant

KRISTINA SHAFFER'S ploy to utilize the reduced BREAST DENSITY in

plaintiff's subsequent IBIS RISK CALCULTION FACTORS. The defendants have behaved hostile, malicious, deceitful, and un lawful in executing this malpractice. SHAFFER furthered this conduct by attempting to convince plaintiff and her spouse there was a drastic change in her breast. SHAFFER also deliberately withheld the plaintiff's reported risk factors from the assessment she administered. Both defendants intentionally planned, narrated, and carried out a misrepresented compilation of medical facts, testing, and advise to the plaintiff.

The defendants at CLEVELAND CLINIC all assumed the same position once the plaintiff discovered, exposed, and requested an explanation for their discriminatory, untruthful, poor, and inferior care provided by the defendants. The defendants and the Ombudsman TRISHIA told the plaintiff to return to her primary physician and seek medical services elsewhere. The plaintiff was uncertain why playing an integral role in her health care delivery would provoke the defendants to abandon, dismiss, and disregard the plaintiff's legitimate concerns regarding her health treatments, medical records, testing, and future assessments the defendants had issued (Biopsy of Right Breast and Genetic Testing). But the defendants continued with the same inappropriate care, especially Defendants TURK (LEBDA) and SHAFFER who provided the plaintiff with requisition for Biopsy for an area in the right breast that was not questionable. The plaintiff

contacted the provider/ombudsman and the defendants refused to have any further in person consultations and advised the plaintiff to seek care elsewhere.

The plaintiff is a member of a racial minority group, which is a protected class. The plaintiff is a member of the BLACK RACE and a female. The defendants discriminated against her on the account of her race, gender, and SES. The defendants provided poor and inferior care. The defendants behaved maliciously and hostile toward the plaintiff. The medical care each provided lacked dignity, respect, and truthfulness. The defendants lied repeatedly, they misrepresented medical data, they concealed and discontinued critical Blood Test Results, they failed to acknowledge any diagnoses, or inform plaintiff of potential follow up treatments, they denied plaintiff testing they initially determined valuable for diagnosis and prognosis, and they reported defamatory, non-factual, and subjective statements in plaintiff's medical record.

These acts align exactly with what the researchers have determined, "has long indicated that poor persons and racial minorities are not viewed desirable patients and health care providers deliver inferior care to persons of low SES (Duff and Hollingshead, 1968; Van Ryn and Bucks, 2000). They further reiterated, "Problems of patient – provider communication is exacerbated among persons of low SES." The defendants demonstrated biased medical decision making and inappropriate medical treatment. Each defendant breached the standard of care and

committed overt discriminatory acts. The defendants' actions violated TITLE VI of the CIVIL RIGHTS ACT of 1964 as described, in Act.

a promising statutory avenue for dealing with discrimination in health care delivery.

TITLE VI prohibits any entity that receives Federal financial assistance from discriminating on the basis of race in providing goods or services to the beneficiaries of that Federal program since federal financial assistance includes MEDICARE and MEDICAID funds, this prohibition against discrimination applies to virtually all hospitals, nursing homes, and health care facilities in the United States.

The courts have firmly held TITLE VI prohibits intentional discrimination and disproportionate adverse impact (Noah 1998). The plaintiff is a recipient of the FEDERAL MEDICARE PROGRAM. The defendants provided the plaintiff inferior treatment and denied her future care as a result of their overt hostile discriminatory acts becoming evident to the plaintiff and her spouse. After the plaintiff reported these deliberate actions the defendants had minimal communication and dismissed the plaintiff by denying any further treatment or dialogue concerning her health status or future care. The defendants conspired to

violate her civil rights all in violation of 42 U.S.C. 1985: Conspiracy to interfere with Civil Rights, 3) Depriving persons of rights or privileges

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived

may have an action for the recovery of damages occasioned by such injury

or deprivation, against any one or more of the conspirators. (R.S. §1980.)

The plaintiff's Civil Rights were violated in a malicious and hostile manner by

generating an intentional deceptive medical narrative, which ultimately resulted in

the defendant's refusal to provided medical care to the plaintiff a Black female and

Medicare recipient. The defendants violated 42U.S.C. Section 1983, Civil action

for deprivation of Rights. The statute provides actions against Private Entities -

Section 1983:

In some cases, wrongdoers are not Federal, state or even local government

entities. They can be privately owned and operated concerns acting pursuant

to a "custom or usage', which had the force of law in the state. *Adickes v.*

*S.H. Kress & Company, 398 U.S. 144 90 S. Ct. 1598, 26 L.Ed.2d 142 (1970)*

Plaintiff was able to prove that she was refused service in a restaurant and

determined to be a vagrant due to her race based on state-enforced custom of

racial segregation, even though no state statute promoted racial segregation

in restaurants."

The defendants breached the standard of care and have left the plaintiff in an

absolute state of chaos and continued chronic pain (right side rib, right breast,

back, leg bones, arm bones, tongue, left lower jaw, severe headaches,

uncontrollable and frequent urination, constipation, insomnia, rash, fatigue, abnormal bloodwork, and emotional and mental distress. Researchers have concluded, "Throughout the history of the United States non-dominant groups have either by law or custom received inferior treatment in major societal institutions. Medical Care is no exception."

## JURISDICTION AND VENUE

1. The defendants GINA K. HESLEY M.D., TIFFANY M. SAE KHO M.D., SANDHYA PRUTHI, M.D. DANIELA L. STAN M.D., and JANE DOE #1 (ULTRASOUND TECHNICIAN) capacity and individual capacity MAYO CLINIC and MAYO CLINIC LABORATORIES 200 First Street SW Rochester, Minnesota 55905 providing medical services to the citizens and has its principal place of business located in Rochester, Minnesota 55905, demonstrating Diversity of Citizenship; pursuant to 28U.S.C. § 1332 the defendants were acting within the scope of that employment/agency/servant relationship when they failed to follow the applicable standard of medical care during their treatment of the plaintiff on September 26 & 27 2019.

2. That the amount sought in this suit exceeds the jurisdiction limit of the state court of Summit County Common Pleas Court of Ohio. Federal question jurisdiction of this court is invoked pursuant to 28 U.S.C. § 1331 (A), 28

"Diversity Jurisdiction is a form of subject matter jurisdiction in civil procedure in which a United States District Court in the federal judiciary has the power to hear a civil case when the amount in controversy exceeds $75, 000 and where the persons that are parties are 'DIVERSE." The amount of plaintiff's claim exceeds $75, 000. Supplemental and/or "pendant" jurisdiction is invoked pursuant to 28 U.S.C. § 1367 and 28 U.S.C. § 1332 Diversity of Citizenship. The acts alleged herein took place or were carried out in the Northern District of Ohio, UNIVERSITY HOSPITALS OF CLEVELAND INC.OH, 11100 Euclid Avenue Cleveland, OH 44106, UNIVERSITY HOSPITAL MACDONALD WOMEN'S HOSPITAL, INC., 8900 Darrow Road Suite H112 Twinsburg, OH, 44087, JOSEPH SHAWI, M.D., J. BOYD, M.D., DANIEL RZEPKA, M.D., capacity, individual capacity UNIVERSITY HOSPITAL HEALTH SYSTEM, BEDFORD MEDICAL CENTER, INC., BEDFORD, OH 44146 as Defendants maintain their principal place of business in CLEVELAND, OHIO.

The acts alleged took place herein were carried out in the Northern District of Ohio, SOUTH SUBURBAN WOMEN'S CENTER 9105 DARROW RD #1821, TWINSBURG, OH 44087 JOHN J. FARINACCI, D.O. dba UNIVERSITY HOSPITAL (PARMA) SYSTEMS of CLEVELAND OH 44129 capacity, individual capacity as Defendants maintain their principal business in CLEVELAND, OHIO.

CLEVELAND CLINIC, 9500 EUCLID AVENUE CLEVELAND, OHIO 44195,

PAULETTE TURK (LEBDA) M.D., KRISTINA SHAFFER, M.D., capacity and

individual capacity. CLEVELAND CLINIC SOUTH POINTE HOSPITAL and

CLEVELAND CLINIC LABORATORY, 20000 HARVARD AVE.,

BEACHWOOD, OH 44122 SAMIR ABRAKSIA M.D., RENEE KEGLOVIC,

ECHO TECHNICIAN, capacity, individual capacity as Defendants maintain their

principal business in CLEVELAND, OHIO.

## COUNT 1: MEDICAL NEGLIENCE

3. That these medical mistakes occurred on February 5, 1999, and many times

thereafter that, in the State of Ohio at UNIVERSITY HOSPITAL SYSTEMS OF

OHIO (BEDFORD, CLEVELAND, and UNIVERSITY HOSPITAL

MACDONALD WOMEN'S HOSPITAL, INC.

4. That on or about February 5, 1999, the Plaintiff underwent a surgery for

Prolapsed Cervical Stump and Bladder Suspension, as recommended and

performed by the Defendants JOSEPH SHAWI M.D. and JOTHAN BOYD, M.D.,

which revealed the presence of an ovarian cyst **SEE EXHIBIT (#14)**.

5. That following the Plaintiff's surgery, the Defendants never informed the

Plaintiff of the findings/ results of the surgical procedure, never informed the

Plaintiff of the presence of an ovarian cyst, never recommended that the Plaintiff

have a follow-up sonogram, and never recommended that the Plaintiff have an OB/GYN consultation.

6. That the standard of medical care applicable to the Defendants during and after surgery that revealed the presence of an ovarian cyst in the Plaintiff's body was to inform the Plaintiff of the presence of the cyst, to refer the Plaintiff for a sonogram, and to refer the Plaintiff for future observation by OB/GYN to monitor for presents of any abnormal changes or masses- cancerous or non-cancerous.

7. As a direct result of the Defendants breaching the applicable standard of medical care owed to the Plaintiff by failing to inform the Plaintiff of the results of the surgical procedure which revealed the presence of the ovarian cyst. In Ohio doctors must obtain Informed Consents for even the simplest procedures, however in this case the physicians failed to obtain consent for the removal of ovarian cyst during surgery and cystoscopy, which revealed and was noted the sutures were through the fatty wall. Those sutures were removed and replaced with another Prolene suture and again, cystoscopy was done and was noted to be satisfactory See **EXHIBIT (#14)**. The defendants were aware they caused severe damage to the fatty wall of the bladder. The Defendants worked hours to repair the damages they caused of which the Plaintiff was never informed of the damages or the repair to the Plaintiff **SEE EXHIBIT (#14)**. Unfortunately, these damages were never fully repaired, which it caused the Plaintiff to suffer ongoing medical problems. By

failing to recommend that the Plaintiff have a follow-up sonogram, Pelvic Cancer Screenings and by failing to refer the Plaintiff for an OB/GYN consultation, the Plaintiff suffered a physical injury to her body.

8. That on February 5, 1999, and many times thereafter, Defendants, JOSEPH SHAWI, M.D., J. BOYD, M.D., DANIEL RZEPKA, M.D., were required to administer continuous medical care, treatment, and advice to the Plaintiff, and at all times that they provided medical care, treatment, and advice to the Plaintiff. Most importantly, they failed under the applicable standard of medical care owed to the Plaintiff to provide due diligence related to the Plaintiff's continuous medical care. "Under R.C. 2305.11(A), a cause of action for medical malpractice accrues and the one-year statute of limitations commences to run (a) when the patient discovers or, in the exercise of reasonable care and diligence should have discovered, the resulting injury, or (b) when the physician-patient relationship for that condition terminates, whichever occurs later. (*Oliver v. Kaiser Community Health Found. [1983], 5 Ohio St.3d 111, 5 OBR 247, 449 N.E.2d 438,* explained and modified

9. That Defendants JOSEPH SHAWI, M.D., J. BOYD, M.D., DANIEL RZEPKA, M.D. and all medical doctors, under the applicable standard of medical care owed a duty to the Plaintiff .The defendant medical doctors breached this duty and standard of care by failing to adequately inform Plaintiff, on February 5, 1999, and

many times thereafter, which resulted in the failure to inform the Plaintiff of the presence of the ovarian cyst as revealed **SEE EXHIBIT (#14),** the failure to recommend that the Plaintiff have a follow-up sonogram, and the failure to refer the Plaintiff for an OB/GYN consultation. As a direct and proximate result of these failures, the Plaintiff suffered a physical injury to her body. All these failures amounted to a breach of the applicable standard of medical care. See in *(Oliver v. Kaiser Community Health Found. [1983], 5 Ohio St.3d 111, 5 OBR 247, 449 N.E.2d 438, explained and modified.*

10. That as a direct and proximate result of the breach of the applicable standard of medical care by the Defendants, the Plaintiff has suffered harm. These harms include: 1) suffered conscious pain and suffering both in the past and, it is expected by her physicians, the future, 2) incurred medical expenses in the past and will incur future medical expenses, 3) suffered mental and emotional sorrow and anguish, 4) suffered permanent physical injuries (enlargement of the ovarian cyst and other additional surgeries related to damages, hysterectomy) and disfigurement, and 5) was required to undergo additional medical procedures and has sustained other damages.

11. That all the injuries and damages sustained by the Plaintiff were the direct and proximate result of the negligent actions and breaches of the applicable standards of medical care by all the Defendants without any act or omission on the part of the Plaintiff directly thereunto contributing.

12. That the Plaintiff did not assume the risk of her injuries.

13. Plaintiff incorporates by reference herein the entire copy of the official Operative Report **SEE EXHIBIT (#15)** which further delineates the breaches of the applicable standards of medical care owed to the Plaintiff by all the Defendants, which proximately caused a physical injury to the Plaintiff.

**COUNT II: Negligence – Medical Malpractice**

(As to Defendants JOSEPH SHAWI, M.D., J. BOYD, M.D., DANIEL RZEPKA, M.D.)

14. The Plaintiff re-alleges and incorporates by reference herein all the allegations contained in paragraphs 1-13 above.

15. That on or about February 5, 1999, Defendants, JOSEPH SHAWI, M.D., J. BOYD, M.D., DANIEL RZEPKA, M.D. breached the applicable standard of medical care owed to the Plaintiff, which directly caused a physical injury to the Plaintiff and was the direct and proximate cause of all the Plaintiff's injuries and damages.

**WHEREFORE**: The Plaintiff claims monetary damages against JOSEPH SHAWI, M.D., J. BOYD, M.D., DANIEL RZEPKA, M.D. collectively and individually in an amount to $ 1.5 million at trial, plus costs, and for any further relief that this Honorable court deems necessary and appropriate to be fixed by the jury.

We further request punitive damages in an amount, so high defendants never do this again.

## COUNT III: Negligence - Medical Malpractice

(As to Defendants JOSEPH SHAWI, M.D., J. BOYD, M.D., DANIEL RZEPKA, M.D.)

16. The Plaintiff re-alleges and incorporates by reference herein all the allegations contained in paragraphs 1-15 above.

17. That Defendants JOSEPH SHAWI, M.D., J. BOYD, M.D., DANIEL RZEPKA, M.D. deviated from the acceptable standard of medical care during the care and treatment of the Plaintiff on or about February 5, 1999 and many times thereafter and that this deviation was the direct and proximate cause of a physical injury to the Plaintiff and the direct and proximate cause of all the Plaintiff's injuries and damages.

**WHEREFORE**: Plaintiff claims money damages against Defendants,

UNIVERSITY HOSPITAL SYSTEMS of CLEVELAND OHIO, UNIVERSITY

HEALTH SYSTEMS, BEDFORD MEDICAL CENTER, UNIVERSITY

HOSPITAL MACDONALD'S WOMEN'S HOSPITAL, TWINSBURG, OHIO,

JOSEPH SHAWI, M.D., J. BOYD, M.D., DANIEL RZEPKA, M.D. collectively

and individually in an amount of $1.5 million at trial, plus costs, and to be

determined at trial, for any further relief that this Honorable Court determines

necessary and appropriate to be fixed by jury.

We further request punitive damages in an amount, so high defendants never do

this again.

## COUNT IV: Negligence - Medical Malpractice

(As to Defendants JOSEPH SHAWI, M.D., J. BOYD, M.D., DANIEL RZEPKA,

M.D.., for failure to give informed information and getting consent from plaintiff)

18. The Plaintiff re-alleges and incorporates by reference herein all the allegations

contained in paragraphs 1-17 above.

19. That Defendants JOSEPH SHAWI, M.D., J. BOYD, M.D., DANIEL

RZEPKA, M.D.  deviated from the acceptable standard of medical care during the

care and treatment of the Plaintiff on or about February 5, 1999 and many times

thereafter by failing to properly provide the medical care and treatment to the

Plaintiff and that this deviation was the direct and proximate cause of a physical injury to the Plaintiff and the direct and proximate cause of all the Plaintiff's injuries and damages.

**WHEREFORE**: The Plaintiff claims monetary damages against Defendants UNIVERSITY HOSPITALS OF CLEVELAND INC.OH, 11100 Euclid Avenue Cleveland, OH 44106, UNIVERSITY HOSPITAL MACDONALD WOMEN'S HOSPITAL, INC., 8900 Darrow Road Suite H112 Twinsburg, OH, 44087, JOSEPH SHAWI, M.D., J. BOYD, M.D., DANIEL RZEPKA, M.D., capacity, individual capacity UNIVERSITY HOSPITAL HEALTH SYSTEM, BEDFORD MEDICAL CENTER, INC., BEDFORD, OH 44146 collectively and individually in an amount of $1.5 million at trial, plus costs, and for any further relief that this Honorable Court deems necessary and appropriate to be fixed by jury.

We further request punitive damages in an amount, so high defendants never do this again.

**COUNT V: Negligence/Medical Malpractice/Respondent Superior/Agency**

20. As to Defendants UNIVERSITY HOSPITALS OF CLEVELAND INC.OH, 11100 Euclid Avenue Cleveland, OH 44106, UNIVERSITY HOSPITAL MACDONALD WOMEN'S HOSPITAL, INC., 8900 Darrow Road Suite H112 Twinsburg, OH, 44087, JOSEPH SHAWI, M.D., J. BOYD, M.D., DANIEL

RZEPKA, M.D., capacity, individual capacity UNIVERSITY HOSPITAL

HEALTH SYSTEM, BEDFORD MEDICAL CENTER, INC., BEDFORD, OH

44146

21. The Plaintiff re-alleges and incorporates by reference herein all the allegations

contained in paragraphs 1-20 above.

22. That during all of the times alleged herein that the Plaintiff was receiving

medical care and treatment from Defendants JOSEPH SHAWI, M.D., J. BOYD,

M.D., DANIEL RZEPKA, M.D., these defendants were employed by

UNIVERSITY HOSPITALS OF CLEVELAND INC.OH, 11100 Euclid Avenue

Cleveland, OH 44106, UNIVERSITY HOSPITAL MACDONALD WOMEN'S

HOSPITAL, INC., 8900 Darrow Road Suite H112 Twinsburg, OH, 44087 and

they were acting within the scope of that employment.

23. The breach of applicable medical care occasioned by their employees, the

defendants herein, which resulted in a physical injury to the Plaintiff.

The plaintiff re-alleges and incorporates by referenced herein all the allegations

contained in paragraphs 1-23 above.

## COUNT VI- FRAUDULENT CONCEALMENT

24. The plaintiff sets forth a cause of action based on intentional fraud as well as

the medical negligence.

25. The Defendant, DANIEL RZEPKA, MD furthered the deception and breach of care, by failing to report relevant information and created a view that did not accurately represent the plaintiff's medical condition. On or about November 20, 2018 the defendant, DANIEL RZEPKA, MD performed a pelvic examination on the plaintiff which included a pelvic hand examination and a colposcopy examination at the UH TWINSBURG MACDONALD HOUSE OFFICE. The physician determined additional testing should be performed and ordered the following: ULTRASOUND TRANSABDOMINAL, ULTRASOUND PELVIS TRANSABDOMINAL WITH TRANSVAGINAL, and a MAMMOGRAM. SEE EXHIBIT ( ).

26. The Defendant, DANIEL RZEPKA, MD breached the standard of care by failing to document in PLAINTIFF'S clinical notes or elsewhere the extent of the pelvic examination performed by him during this session, which entailed utilizing a colposcopy- "instrument with a light and magnifier to make abnormal areas easier to see." **SEE EXHIBIT (#16 )11/18/office visit**. The defendant's medical receptionist inferenced this pelvic examination with colposcopy when plaintiff picked up medical record at the Twinsburg office by acknowledging "we did not do a biopsy on you from the examination." Non-disclosure of pertinent medical information, especially when it is intentionally withheld to manipulate a medical

narrative is a breach of care and points to fraudulent activities committed by Daniel RZEPKA, MD.

27. DANIEL RZEPKA, MD advanced this fraudulent act by purporting a fraudulent ULTRASOUND PELVIS TRANSABDOMINAL WITH TRANSVAGINAL REPORT which was never performed on DECEMBER 5, 2018. The physician knowingly and willing misrepresented the fake report to the plaintiff as legitimate. **SEE EXHIBIT (#17). Report contains no data and there is no available report to access per UNIVERSITY HOSPITAL RADIOLOGY IMAGING DEPARMENT RECORDS- Main Campus CLEVELAND OHIO 44106.**

The plaintiff alleges and incorporates by reference herein all the allegations contained in paragraphs 1-27 above.

28. The defendants, DANIEL RZEPKA M.D., JOSEPH SHAWI M.D. ,and JONTHAN BOYD M.D. statute of limitations should be stricken, when a defendant, by deception has caused  a plaintiff to delay suit on a known cause of action until the Statue of Limitations has run, the courts will apply the doctrine of estoppel to prevent an inequitable use of the statue by defendant as defense (*Arbutina v Bahuleyan, .7.5A.D.2d 84, 86, [1980], citing Simcuski,v Saeli 44 N.Y.2d at 448-450*).

29. The AMERICAN COLLEGE of OBSTERICIANS and GYNECOLOGIST (ACOG), reiterated that physicians, "Misrepresentation of clinical opinion and absolute right or wrong may be harmful to individual parties and the profession a large. More importantly, "TRUTHFULNESS IS ESSENTIAL." DANIEL RZEPKA, MD, was alerted by the Plaintiff that NO ULTRASOUND PELVIS TRANSABDOMINAL WITH TRANSVAGINAL had been performed on the Plaintiff December 5, 2018. The defendant, despite the plaintiff's explanation attempted to convince the plaintiff the testing was performed. This was the most egregious act the defendant maintained this intentional deceitful activity.

30. DANIEL RZEPKA, MD, knew or should have easily been aware of this fake report **SEE EXHIBIT (#17)**. The alleged fraudulent ULTRASOUND PELVIS TRANSABDOMINAL WITH TRANSVAGINAL reflects numerous deficiencies. DANIEL RZEPKA, M.D. contacted the plaintiff by phone concerning the findings of the reports and purposefully acted in a deceitful manner by continuing to promote a non-existent ULTRASOUND PELVIS TRANSABDOMINAL WITH TRANSVAGINAL.

31. The plaintiff's fraud cause of action should weigh heavily; the plaintiff subsequently required additional surgeries, severe ongoing suffering physical pain and symptoms, deprivation of normal enjoyments of life, suffering and anguish, emotional and mental distress. Several losses were a direct result of the

malpractice, while others were the consequences from the fraudulent concealment of the defendants. The plaintiff sought treatment and additional testing but was deprived of an opportunity for cure due to the purposeful concealment and deception of the defendants. *Rochester Fund Muns.* v *Amsterdam Mun. Leasing Corp., 296 A.D.2d 785, 788 [2002]*; see *Spinosa v Weinstein, 168 A.D.2d32,41-42 [1991]; cf. Rinker v Oberoi, 27.5 A.D.2d 1000,1001[2000])*

32. The defendants, DANIEL RZEPKA, M.D., JOSEPH SHAWI, M.D. and J. BOYD, M.D. ongoing medical negligent acts, involved deficiencies, incompetence's, along with consistently engaging in deception by providing the plaintiff with a fraudulent and misleading medical status. The defendant's consistent purposeful concealment and making use of medical equipment (Ultrasound Imaging Machine- University Hospitals Systems Bedford, OH) to mislead the plaintiff and deprive her of a truthful and complete disclosure of plaintiff's healthcare status. The acts which occurred are as follows: The defendants silence related to the medical errors committed during the surgery, the intentional suppression of plaintiff's treatments, the denial of plaintiff to acquire follow up care due to purposeful failure or omission of medical facts and producing a fraudulent ULTRASOUND PELVIS TRANSABDOMINAL WITH TRANSVAGINAL test result.

The plaintiff re-alleges and incorporates by reference herein all the allegations contained in paragraphs 1-32 above.

## COUNT VII- RIGHT of AUTONMY

33. Constitutional right of autonomy. Defendants failure to inform the Plaintiff of the botched surgical treatment, the NON-DISCLOSURE of pertinent medical data such as: complete pathology results from tissue, masses, cysts, or body parts, specifically any findings which demonstrated a definitive conclusion. Defendants failure to recommend plaintiff have follow up care such as: obtain results from tubal pathology, Ultrasounds transabdominal and transvaginal, sonograms, and specific pelvic cancer screenings, and test. This series of acts violated the plaintiff's constitutional rights and breached the standard of care by the physicians. According to (Sonny, 2009) "The doctor is said to owe a duty of reasonable professional care to patient." The physicians elected to deny plaintiff of her constitutional right of autonomy- by concealing medical errors, omission of pertinent surgery facts, and neglecting to make plaintiff aware of required follow up medical testing, consultation, or treatments related to the above. This breach of standard of care is so egregious that expert testimony is not needed *Res Ipas Loquitur*. The violation of plaintiff's Constitutional Rights to personal autonomy

and bodily interest as regarded under the United States Constitution and laws

U.S.C.A. Const. Amend 14;42 U. S. C. A. § 1983.


34. The defendants JOSEPH SHAWI, M.D., J. BOYD, M.D., DANIEL RZEPKA,

M.D., these defendants were employed by UNIVERSITY HOSPITALS OF

CLEVELAND INC.OH, 11100 Euclid Avenue Cleveland, OH 44106,

UNIVERSITY HOSPITAL MACDONALD WOMEN'S HOSPITAL, INC., 8900

Darrow Road Suite H112 Twinsburg, OH, 44087 are responsible for failed to

provide the applicable professional standard of disclosure and it is established that

it was breached.

The defendant's decision to withhold disclosure for consent from relatives who

could act by proxy for plaintiff - plaintiff's husband or mother, disclosure would

have been advisable and anticipated by any reasonable patient. "All information

"material" to the decision of a reasonable patient must be" unmasked." *Canterbury*

*v. Spence, 464 F.2d 772 (D.C.Cir.1972)* An appropriate disclosure of surgical

performance, postoperative diagnosis, and most importantly disclosure adequate

for plaintiff's future medical treatments. Furthermore, "when an unanticipated

condition arises during an authorized procedure requiring immediate action for the

preservation of life or health of the patient courts have held that the physician may

extend the scope of the treatment if it is impracticable first obtain consent of the

patient or a surrogate …(*Preston v. Hubbell, 87 Cal.App.2d 53, 196P.2d.)* Treatment performed in the absence of valid consent may constitute a battery and be actionable without expert testimony on the standard of care.

35. Moreover, since recovery may be based on the invasion of one's dignitary interests, one may recover for battery even in the absences of physical harm." (pg. 138). The physicians failed to disclose the error which they'd brought about, and never made the plaintiff aware of the full scope of the surgical procedures performed- sutures placed in bladder, sutures subsequently removed from bladder following other major components of the surgical procedure, paravaginal repair, cystectomy. The plaintiff continued to experience the same and more chronic symptoms following the debacle and concealed surgical procedure, which required subsequent surgery and treatment

36. Defendants had a fiduciary relationship and failed to speak where there is a duty to speak is equivalent to some positive act or artifice to plan to prevent injury or escape investigation. There must be a duty resting on the party knowing such facts and disclose them. For example, such a duty arises where a confidential relationship exists, as between physician and patient. In such cases, there is a duty to disclose, and that duty may render silence or failure to disclose known facts

fraudulent. *Benton, 825 S.W.2d at 414* (emphasis in original) (citations omitted)."
Id.


37. The defendants fraudulent concealment having knowledge of the facts that gives rise to the cause of action. The physicians were aware of the wrong done and concealed the information from the plaintiff; *(Ray, 484 S.W.2d at 72)*.

The plaintiff re-alleges and incorporates by reference herein all the allegations contained in paragraphs 1-37 above.

**WHEREFORE**: The Plaintiff claims monetary damages against Defendants UNIVERSITY HOSPITALS OF CLEVELAND INC.OH, 11100 Euclid Avenue Cleveland, OH 44106, UNIVERSITY HOSPITAL MACDONALD WOMEN'S HOSPITAL, INC., 8900 Darrow Road Suite H112 Twinsburg, OH, 44087, JOSEPH SHAWI, M.D., J. BOYD, M.D., DANIEL RZEPKA, M.D., capacity, individual capacity UNIVERSITY HOSPITAL HEALTH SYSTEM, BEDFORD MEDICAL CENTER, INC., BEDFORD, OH 44146 collectively and individually in an amount of $1.5 million at trial, plus costs, and for any further relief that this Honorable Court deems necessary and appropriate to be fixed by jury.

We further request punitive damages in an amount, so high defendants never do this again.

**COUNT VIII- NEGLIGENCE MEDICAL MALPRACTICE**

38. The defendants GINA K. HESLEY, M.D., SANDHYA PRUTHI, M.D., TIFFANY M. SAE KHO, M.D., DANIELA L. STAN, M.D., and JANE DOE #1 (Ultrasound Technician) capacity and individual capacity MAYO CLINIC and MAYO CLINIC LABORATORIES 200 First Street SW Rochester, Minnesota 55905 providing medical services to the citizens and has its principal place of business located in Rochester, Minnesota 55905 , demonstrating Diversity of citizenship; the defendants were acting within the scope of that employment/agency/servant relationship when they failed to follow the applicable standard of medical care during their treatment of the plaintiff on September 26-27, 2019.

39. That Defendant MAYO CLINIC is a Minnesota providing medical care. Defendants GINA K. HESLEY M.D. -Lead Radiologist, TIFFANY M. SAE KHO M.D. -Fellow and JANE DOE #1 on September 27, 2019 performed at the Breast Imaging Exam at Mayo Clinic in the Department of Radiology at Rochester, Minnesota site. The Plaintiff's reason for visit: pain in breast (N64.4) and abnormal mammogram (793.80). HESLEY examined the BI BREAST DIAGNOSTIC BILATERAL with TOMOSYNTHESIS and BI ULTRASOUND BREAST FOCUSED RIGHT. HESLEY, determined the following: A Palpable Lump Right Breast, Compared and Reviewed Prior Exams (University Hospitals Systems -Bedford /Cleveland Radiology), and Categorized Density of Plaintiff's

Breast "DENSITY C." The breasts are heterogeneously dense," HESLEY'S findings from the FOCUSED ULTRASOUND she performed and reported were "no suspicious findings, normal appearing Fibro glandular tissue." **SEE EXHIBIT (#18)**

40. The defendant, HESLEY, did however, perform an additional ULTRASOUND of the plaintiff's RIGHT BREAST, which she reported as an "INCIDENTALLY FOCUSED ULTRASOUND in the right subareolar breast at 7:00, which demonstrates a benign-appearing ectatic dilated duct with 4 mm cyst. No suspicious findings." **SEE EXHIBIT (#18)**

41. The DEFENDANTS, GINA K. HESLEY M.D. and TIFFANY M. SAE KHO M.D. failed to make plaintiff aware of this breast change demonstrated from the "INCIDENTALLY FOCUSED ULTRASOUND." The defendants NON-DISCLOSURE of this pertinent medical data revolving around the uncertain mass-"benign appearing…" and how this new finding weighed with the other significant risk factors, which HESLEY had determined such as; Palpable lump in right breast, Heterogeneously dense breast, DENSITY -C, Family history of Breast Cancer, and the plaintiff's consistent and ongoing complaints of chronic Right Breast and Right -Side pain. The defendants, HESLEY M.D., SAE KHO's M.D.

and JANE DOE #1 (ULTRASOUND TECHNICIAN WHO FAILED TO SPEAK WHEN SHE WAS AWARE and IDENTIFIED and ALERTED THE DEFENDANTS of the AREA OF CONCERN, which they engaged in a NON-DISCLOSURE and breach in the standard of care. Their actions or inactions took the plaintiff out of the equation of deciding her own healthcare choices.

The plaintiff re-alleges and incorporates by reference herein all the allegation contained in paragraphs 1-41 above.

42. The defendants had a fiduciary relationship and failed to speak where there is a duty to speak is equivalent to some positive act or artifice to plan to prevent injury or escape investigation. There must be a duty resting on the party knowing such facts and disclose them. Such a duty arises where a confidential relationship exists, as between physician and patient. In such cases, there is a duty to disclose and that duty may render silence or failure to disclose known facts fraudulent.

43. The plaintiff, as the courts and legal scholars have concluded, "an individual right to self- determination with respect to her physical integrity is rigorously guarded by courts. Justice Cardozo long ago declared" [c] every human has a right to determine what shall be done with his own body" *Schloendorff v. Society of N.Y.*

*Hosp., 211 N.Y. 125,129, 105 N.E. 92 93 (1914).* The effects of

MISREPRESENTATION and NON-DISCLOSURE of information" inhibits

/limits "patient's right to Informed Decision-Making must be considered."

(2305.113 Medical Malpractice Actions ORC).


44. The defendants, DANIELA L. STAN M.D. and SANDHYA PRUTHI M.D.

furthered this narrative by purposeful concealment which was acted out with

callous indifference to the effects such suppression of the plaintiff's complete

medical data would have on the physical and mental health of the plaintiff

especially the violation of plaintiff's Constitutional Rights to personal autonomy

and bodily interest as regarded under the United States Constitution and laws

U.S.C.A. Const. Amend 14;42 U. S.C. A. § 1983. Because of the defendants,

SANDHYA PRUTHI M.D. and DANIELA L. STAN M.D. purposeful

concealment of the "Incidentally Focused Ultrasound findings, the plaintiff had no

reason to know of her possible claims for relief until or about January 2020, when

the plaintiff obtained her medical report and identified the "INCIDENTALLY

FOCUSED ULTRASOUND was performed in the RIGHT SUBAREOLAR

BREAST at 7:00, which demonstrates a BENIGN-APPEARING ECTATIC

DILATED DUCT WITH 4mm CYST. No suspicious findings."

45.  The purposeful concealment and subsequent discovery by the plaintiff of the

4mm unconfirmed mass (which defendants reported as "BENIGN -APPEARING,"

lacking a definitive pathology) in the dilated duct of her Right Breast led to an

enormous measure of emotional distress, suffering, and continued severe right

breast and right-side pain.


46.The medical information provided by defendant, SANDHYA PRUTHI M.D.

did not lay out the full scope of medical data she had knowledge of regarding the

plaintiff's right breast on September 27, 2019 during the Breast Office Visit

Consultation. Defendant, PRUTHI, failed to make the plaintiff aware of any

changes in breast, specifically the new "INCIDENTALLY FOCUSED

ULTRASOUND" findings. The defendant, PRUTHI, explained and recommended

plaintiff and her primary care physician consider supplemental screenings- MRI or

MBI in addition to the mammogram and ultrasounds that had been performed at

MAYO CLINIC ROCHESTER, MINNESOTA on September 27,2019. This

advice was based on the findings as noted in progress notes **SEE EXHIBIT (#19)**

Family history of breast Cancer she would be eligible for MRI screening, and the

IBIS risk calculator Defendant, STAN had performed taking into account "C "

Density, which estimated a 21% lifetime risk for developing Invasive Breast

Cancer .Additionally, SANDHYA PRUTHI M.D. described the pros and cons of a

Molecular Breast Imaging (MBI) and the cost along with the insurance issues that should be deliberated for testing.

47. SANDHYA PRUTHI and DANIELA L. STAN's negligent infliction of emotional distress from the defendants' deliberate act of NON-DISCLOSURE prevented the Plaintiff from being an integral part of her own healthcare choices. The plaintiff's constitutional rights of personal autonomy and bodily interest were violated. Subsequently, the plaintiff suffered severe emotional distress, physical suffering, and continued chronic right -side and right breast pain. "A reasonable official would have understood that her/his actions violated the plaintiff's right to bodily integrity U.S.C.A. Const. Amend. 14;42 U.S.C.A, § 1983.

48. The above-named defendants further errored by intentionally withholding the disclosure.

The Plaintiff requested her entire medical records from the above-mentioned defendants in January 2020. The September 26 &27, 2019 MAYO BREAST DIAGNOSTIC CLINIC visit included the following: Breast Cancer Risk Diagnosis/ Consultation, Imaging-Mammogram, and Ultrasounds. After obtaining the medical records dated January 28, 2020 the Plaintiff discovered an "Incidentally focused Ultrasound was performed in the right subareolar breast at

7:00, which demonstrates a benign-appearing ectatic dilated duct with 4mm cyst. No suspicious findings," which she was never made aware of by any of the defendants, GINA K. HESLEY M.D., TIFFANY M. SAE KHO M.D., JANE DOE #1, SANDHYA PRUTHI, M.D. and DANIELA L. STAN, M.D. As a matter of fact, the defendants GINA K. HESLEY, M.D. and TIFFANY M, SAE KHO, M.D. explained to the plaintiff there were no findings during and after the Ultrasound testing; "the plaintiff should resume with regular routine breast exams."

49. The "Incidentally focused Ultrasound" testing and findings were omitted during the consultation on September 27, 2019 by SANDHYA PRUTHI M.D, GINA K. HESLEY, M.D. and TIFFANY M. SAE KHO M.D. committed the same identical action by omitting the "Incidentally focused Ultrasound" findings during their consultation directly after Ultrasounds were performed on September 27, 2019. They purported a narrative that did not reflect any masses or cyst in the Plaintiff's right breast.

50. According to the medical experts of the American Cancer Society (2019) "The doctor evaluating breast images should be on the lookout for changes in breast and "abnormal masses and other suspicious areas that could be signs of cancer" Masses can be many things including cysts (non-cancerous, fluid filled sacs) and non-cancerous solid tumors, but they may also be a sign of cancer." (2019) The

defendants silence and intentional omission of such pertinent medical data was a deliberate act by the defendants to conceal this medical data.

51. The American Cancer Society (2019) reported, A cyst and a solid mass can appear to feel and look similar on breast imaging; "the doctor must be sure it's a cyst to know it's not cancer breast ultrasound it is a better tool to see fluid filled sacs. Another option is to use a thin hollow needle to remove (aspirate) fluid from the area." (www.cancer.org). The defendants discovered what they described as a "benign appearing dilated duct with a 4mm cyst and did nothing. This finding was never revealed to the Plaintiff. The American Cancer Society has determined factors revolving around the "appearances of a cyst or a mass in the breast may require more concern."

52. An "Incidentally performed Ultrasound," was reported but fails to provide a definitive identification of the type of cyst, which the American Cancer Society (2019) elaborates on the criticality of determining if the cyst has fluid filled sacs, if it is a solid tumor, or a sign of cancer. "A biopsy might be required to be sure it is not cancer," (American Cancer Society, 2019). In addition, the

American Cancer Society, (2019)- doctors, and oncology certified nurses with deep knowledge of cancer care further concluded, If the doctor doesn't

think you need a biopsy, but you still feel there's something wrong with your breast, follow your instincts Don't be afraid to talk to the doctor about this or go to another doctor for a second opinion. A BIOPSY IS THE ONLY SURE WAY TO DIAGNOSE BREAST CANCER."

The plaintiff re-alleges and incorporates by reference herein all the allegations contained in paragraphs 1-52 above.

53. The Plaintiff was never made aware of the above finding until she obtained her medical records, at which time the Plaintiff immediately requested an additional consultation from the physicians to disclose and explain the finding. through the MAYO CLINIC Patient Experience **SEE EXHIBIT (#20).**

54. The plaintiff followed up with written and phone communication with MAYO CLINIC Patient Experience concerning this pivotal omission of objective medical data related to her breast health (**SEE EXHIBIT #21**) second request for consultation of "INCIDENTALLY FOCUSED ULTRASOUND finding" The request for verbal consultation from the Defendants SANDHYA PRUTHI, M.D., DANIELA L. STAN, M.D., GINA K. HESLEY M.D. or TIFFANY M. SAE KHO, M.D. failed to be achieved. The plaintiff received two additional documents

one titled "Amended," which failed to address the Incidentally focused Ultrasound and findings. The "AMENDED" document contained information from the visits, it did not however, point how why this finding was concealed from Plaintiff. **SEE EXHIBIT (#21a) Response from defendants which contained NO explanation of NON-DISCLOSURE of "INCIDETALLY FOCUSED ULTRASOUND 4mm BENGIN APPEARING CYST…".** The defendants had a fiduciary duty (physician and patient) to disclose and were aware of the wrong done. The defendants concealed the information from plaintiff.

55. The plaintiff's Paraneoplastic Autoantibody Eval, S laboratory testing, from February 15, 2016 at the MAYO CLINIC LABORATORIES, 3050 Superior Drive NW, Rochester, Minnesota 55901 should have been a critical component in the defendants' evaluation. The testing and findings from the Paraneoplastic Autoantibody Evaluation, Serum, clearly put the above physicians on notice of an inquiry of Plaintiff's Cancer risk factors or a recurrent cancer, MAYO CLINIC Laboratories (1995-2020), reports the test as, "directing a focused search for cancer," **SEE EXHIBIT (#22)** A Mayo Clinic Laboratories, Test ID Paval Paraneoplastic Autoantibody Evaluation, S (1995-2020) cautions, physicians and the public regarding negative findings, "Negative results do not exclude cancer." The plaintiff's test results revealed negative data, and other findings that required

disclosure to the plaintiff, for the plaintiff to obtain the additional testing mentioned in results such as, the CRMP-5 Western Blot Analysis. The results of a CRMP-5 were available by request-(only) on stored serum that would have provided additional and more substantive findings. **SEE EXHIBIT (#23) plaintiff test results**.

56. The Defendants failed to disclose pertinent medical data, to obtain proper medical history, or provide a thorough examination of Alycia Taylor, giving no attention to the February 15, 2016 Paraneoplastic Autoantibody Evaluation, Serum performed by MAYO CLINIC at MAYO CLINIC LABORATORIES, which MAYO CLINIC reports is a "focused search for Cancer." **SEE EXHIBIT (#22).** The defendants NON-DISCLOSURE obstructed the plaintiff's ability to obtain additional testing by request and share with future medical professionals to access proper treatment in accordance with the standard of care for physicians specializing in the unresolved and undiagnosed areas.  MAYO CLINIC LABORATORIES, MAYO CLINIC, Defendants GINA K, HESLEY M.D., SANDHYA PRUTHI, M.D. DANIELA L. STAN, M.D., TIFFANY M. SAE KHO, M.D. providing medical care at Rochester, Minnesota knew or should have known the past Paraneoplastic Autoantibody Evaluation, Serum cancer testing and followed the appropriate standard of care measures.

57. The above-named defendants further errored by intentionally withholding from the

plaintiff knowing such facts and concealing them resulted in fraudulent concealment.

The plaintiff re-alleges and incorporates by reference herein all the allegations contained in paragraphs 1-57 above.

**WHEREFORE**: The plaintiff claims monetary damages against Defendants MAYO CLINIC, MAYO CLINIC LABORATORIES, GINA K. HESLEY, M.D., SANDHYA PRUTHI, M.D., TIFFANY M. SAE KHO, M.D., DANIELA L. STAN M.D., JANE DOE #1- ULTRASOUND TECHNICIAN, capacity, individual capacity, 200 First Street SW Rochester, MN 55905 collectively and individually in an amount of $1.5 million at trial, plus costs, and for any further relief that this honorable Court deems necessary and appropriate to be fixed by jury.

We further request punitive damages in an amount, so high defendants never do this again.

**COUNT IX-Negligence-Medical Malpractice**

58. California Supreme Court held that a physician must disclose economic or research interests unrelated to the patient's health" that might affect the physician's judgment. *Moore v. Regents of the University of California, 793 P.2d 479 (Cal.1990)* The defendant's GINA K. HESLEY, M.D., SANDHYA PRUTHI M.D., DANIELA L. STAN, M.D. TIFFANY M. SAE KHO, M.D. and JANE DOE #1 (Ultrasound Technician) have what is seemingly a distinct interest in the plaintiff's present medical status and past medical history.

59. The defendants research publications align very closely to the plaintiff's past breast symptoms and testing- dense tissue, fibrous glandar nodules, and supplemental testing by Mammograms and Ultrasound. The Mayo Clinic and the defendants discovered a change in right breast from the "Incidentally focused Ultrasound ...4mm cyst," this finding provided additional medical data that increased their interest of plaintiff's breast health.

60. It is clear, despite the new findings, the defendants had no intention of making Plaintiff aware of the results from "Incidentally focused Ultrasound..." which they performed, until the plaintiff became aware of the Incidentally focused Ultrasound

after reviewing her medical record (Jan 2020 request) and requested further consultation.

61. The defendants, did however, act to pursue the release of the Plaintiff's medical care and records to be utilized in MAYO CLINIC'S highly esteemed Research and Educational Programs. According to About MAYO CLINIC, the MAYO CLINIC MISSION is, "To inspire hope and contribute to health and well-being by providing the best care to every patient through integrated clinical practice, education and research." (Mayoclinic.org,1998-2020)

62. DANIELA L. STAN M.D. and SANDHYA PRUTHI M.D. have published Medical Research Articles that offered a profoundly different medical approach, contrary, to the health care they provided for the Plaintiff on September 26 and 27 2019 and following care/communications. The Defendants breached the standard of care as a direct and proximate result of Defendants actions and inactions the Plaintiff was harmed.

The MAYO CLINIC'S MISSION surely has impacted the defendants **SEE EXHIBIT (#24)** MAYO CLINIC has determined to provide "the best care to every patient" by several factors mentioned in their MISSION STATEMENT: "INTERGRATED CLINICAL PRACTICE, EDUCATION, and RESEARCH." The defendant's and their employer have a passion for research. This commitment

is contained and expressed by written expectations in their mission statement. The high regard for research and educational experiences, as described in their mission statement above seems rational to impel the Defendant's to solicit and promote research that aligns with MAYO CLINIC'S and their own personal clinical research. In a complete paradigm shift, the defendants became more concerned about RESEARCH than providing the plaintiff with proper treatment, disclosure of her pertinent medical data, and providing the appropriate standard of care. The defendants did this with numerous RESEARCH requests. The Defendant's, DANIELA L. STAN, M.D., SANDHYA PRUTHI, M.D. and GINA K. HESLEY M.D. have extensive professional research and publications, which aligns closely with the Plaintiff's medical diagnosis, care, and radiology testing at MAYO CLINIC and past medical institutions, which add prima facie evidence to Plaintiff's claims. **SEE EXHIBIT (#25).** 31 pgs **IN ITS ENTIRITY**

63. The Plaintiff was not privy to a complete disclosure of her health care treatments- Autoantibody Paraneoplastic Evaluation, Serum Testing performed at MAYO CLINIC LABORATORY or the "Incidentally Focused Ultrasound performed of the right subareolar breast at the 7 o'clock position which demonstrated a benign appearing dilated duct with a 4 mm cyst." The defendants

had superior knowledge with each of the medical encounters the plaintiff

participated in. The plaintiff relied on the defendant's knowledge" and expertise.

> The Legal dictionary (n.d.) determined: Where one party exploits a position
>
> of trust and confidence or a fiduciary relationship. Fiduciary relationships
>
> include those between attorneys and clients, physicians and patients... A
>
> statement need not be affirmative to be fraudulent. When a person has a duty
>
> to speak, silence may be treated as a false statement." This can arise if a
>
> party who has knowledge of a fact fails to disclose it to another party who is
>
> justified in assuming its nonexistence."

64. The Plaintiff was denied disclosure of "Incidentally Focused Ultrasound..."

but, however, was contacted through the U.S. mail to request release of her

medical records to be utilized for research and educational purposes. The Plaintiff

received repeated requests to release her medical data for research and educational

purpose at MAYO CLINIC in Rochester, Minnesota. The Plaintiff responded by

contacting MAYO CLINIC'S AFT office and sending written documentation

refusing participation for Medical Research **See Exhibit (#26a)**. The plaintiff

contacted the Federal Medicare Program to deny participation in the MAYO

CLINIC'S and its constituents RESEARCH and EDUCATION activities **SEE**

**EXHIBIT (#26**) **MEDICARE'S response to plaintiff's request refusing participation in MAYO'S RESEARCH and EDUCATION.**

65. The defendants, SANDHYA PRUTHI, M.D., DANIELA L. STAN M.D., and GINA K. HESLEY, M.D. have professional research interest and significant research studies/publications that are centered at MAYO CLINIC, Breast diagnosis, Breast testing, and Imaging related to women's health, which provides vital data for Breast Screening/Test, especially to improve the identification and management of high-risk women. **SEE EXHIBIT (#27).** The defendants have a considerable measure at stake, especially when one considers their professional roles as discussed in MAYO CLINIC FACULTY CLINICAL PROFILES, SANDHYA PRUTHI, M.D.-" Principal investigator at Mayo Clinic for several nationwide multicenter breast cancer chemoprevention trials… and alternatives therapies in women who are at increased risk of breast cancer," which the plaintiff was identified by the defendants September 26 & 27,2019 "based on family history and elevated breast cancer risk." The plaintiff's "IBIS risk calculator was estimated at 21% lifetime risk- alleviated for developing invasive breast cancer."

66.  SANDHYA PRUTHI 'S M.D. research is significant as stated in her profile "it aims to improve the identification and management of high-risk women. The

knowledge and understanding gained from conducting clinical trials to study new medications or therapies in women at increased risk of breast cancer will lead to significant impact in improving patient care by being able to individualize risk-reducing strategies based on the level of breast cancer risk.

67. SANDHYA PRUTHI M.D. was also awarded the Distinguished Service in Cancer Education: Professional Award, Mayo Clinic Cancer Center Education Network. The defendant possesses an array of professional accolades and research publications that are related to the plaintiff's past breast issues and the newly discovered suppressed abnormal finding. Which, further, leads credence to plaintiff's claims and evidence submitted; the researcher's professional interest of the plaintiff's breast status- high risk woman. SANDHYA PRUTHI M. D. determined she had no duty to disclose the new abnormal mass that was revealed from "Incidentally Focused Ultrasound…" The nondisclosure demonstrated a breach in the standard of care to the plaintiff.

68. Defendant, DANIELA L. STAN M.D. has been the Co-Chair of The MAYO BREAST CLINIC RESEARCH COMMITEE, Department of Internal Medicine from 2017 to present, and have numerous research publications. DANIELA L. STAN M.D., SANDHYA PRUTHI, M.D. and GINA K. HESLEY M.D.), have robust current and evolving breast related clinical trials that are under the auspices of the MAYO CLINIC'S BREAST RESEARCH- Cancerous/Noncancerous. The

Plaintiff's breasts were identified as "heterogeneously dense- C", which may obscure small masses." This factor, Breast Density and Testing are areas of the Defendants primary research interest. Moreover, the irrefutable evidence, which clearly points out the Mayo Clinic's importance of research and education in their mission statement **SEE EXHIBIT (#24).**

69. The plaintiff re-alleges and incorporates by reference herein all the above allegations contained in paragraphs 1-68 above.

**WHEREFORE**: The Plaintiff claims monetary damages against Defendants MAYO CLINIC 200 FIRST STREET SW ROCHESTER, MINNESOTA 55905, GINA K. HESLEY M.D., TIFFANY M. SAE KHO, M.D., PRUTHI SANDHA M.D., DANIELA L. STAN, M.D. capacity, and individual capacity in an amount of $1.5 million at trial, plus costs, and for any further relief that this Honorable Court deems necessary and appropriate to be fixed by jury.

We further request punitive damages in an amount, so high defendants never do this again.

## COUNT X:  FRAUD CONCEALMENT

70.  The defendant, JOHN J. FARINACCI, D.O. and JANE DOE #2 (Ultrasound Technician/ Medical Assistant) at South Suburban Women's Center, 9105 Darrow Rd Twinsburg, OH 44087, doing business as (dba) University Hospital Systems Cleveland Ohio, University Hospitals Parma Medical Center, Parma, Ohio **See**

**Exhibit (#1 and #2)**. The Defendants at South Suburban Women's Center in Twinsburg, OH 44087 dba as University Hospitals Parma Medical Center, Parma, OH have deliberately represented themselves as constituents or as employees of the University Hospitals Systems of Cleveland Ohio, the University Hospitals Parma Medical Center, Parma Ohio and breached the standard of care required by licensed medical professionals in their capacity.

71. The Plaintiff sought additional medical treatment for her continued chronic right flank and abdominal pain. The Defendant, JOHN J. FARINACCI, D.O. at the South Suburban Women's Center, 9105 Darrow Rd Twinsburg, OH had evaluated the Plaintiff in 1998 for a second opinion related to the 1999 Hysterectomy. On June 6, 2019 the Plaintiff returned to the South Suburban Women's Center, Twinsburg OH location, to seek immediate medical care distinct from the University Hospitals Systems of Cleveland, OHIO – University Hospitals MacDonald House OB & GYN, Twinsburg, University Hospitals Bedford, or any other entity of the University Hospital Systems.

72. The defendant, JOHN J. FARINAACCI D.O., however, was clothed in a white laboratory coat as soon as the plaintiff and her husband, Kenneth Taylor encountered JOHN J FARINACCI D.O. this was a visible concern. JOHN J.

FARINACCI D.O. was clothed in a long white lab coat. The long white lab coat he wore during the appointment displayed the University Hospital's symbol and Name. The plaintiff's husband questioned the doctor on "Why are you wearing a University Hospital Lab Coat?" JOHN J. FARINACCI D.O. replied, "it was just lying around, no reason." The defendant continued his examination he allegedly performed a pelvic cancer screening, which he took from the plaintiff's internal pelvic area with a cotton suave, which he left open lying on the medical table.

73. The plaintiff requested a pelvic/cervical and breast screening that was recommend by. several doctors. The defendant was hesitant to perform either, but subsequently provided the plaintiff with a requisition for a Screening Mammogram. This requisition was presented on a University Hospital s of Parma OH prescription **SEE EXHIBIT (#2)**, which created more doubt and trepidation related to the defendant's fraudulence.

The Plaintiff re-alleges and incorporates by reference herein all the allegations contained in paragraphs 1-73 above.

**WHEREFORE:** Plaintiff claims money damages against defendants, SOUTH SUBURBAN WOMEN'S CENTER 9105 Darrow Rd #1821, Twinsburg, OH 44087, JOHN J. FARINACCI, D.O., dba UNIVERSITY HOSPITAL (PARMA) SYSTEMS of CLEVELAND OHIO collectively and individually in an amount of

$1.5 million at trial, plus costs, and to be determined at trial, for any further relief that this Honorable Court determines necessary and appropriate to be fixed by jury. We further request punitive damages in an amount, so high defendants never do this again.

**74. Who**: Plaintiff, Alycia Taylor

**When:** On June 26, 2020 on or about 11:00 a.m.

**Where**: CLEVELAND CLINIC LABORATORY SOUTH POINTE HOSPITAL 20000 Harvard Ave. Beachwood OH 44122.

**What**:  The plaintiff acquired bloodwork testing from defendants.

**How**: The laboratory testing was from a requisition provided by the plaintiff's primary care physician, ERIN M. HILLARD D.O., NOMS Healthcare 7515 Fredle Dr, Concord, OH 44077. The requisition contained fifteen specific bloodwork tests, including a COMPLETE BLOOD COUNT (CBC) **SEE EXHIBIT (#28) The CBC request is the second to last item contained in requisition.** The diagnoses included the following International Classification Codes D70.9-NEUTROPENIA UNSPECIFIED- (ABNORMALLY LOW LEVELS OF NEUTROPHILS-WHITE BLOOD CELLS, DISEASES OF BLOOD AND BLOOD DISORDERS), R53.83- (FATIGUE and OTHER CONDITIONS MARKED BY DROWSINESS, LACK OF ENERGY), R.61- (GENERALIZED HYPERHIDROSIS, NIGHT SWEATS), L29.9- (DERMATITIS, ECZEMA,

INFLAMMATION OF SKIN). Defendant, SAMIR ABRASKIA breached the standard of care he failed to properly treat, diagnose, and disclose any medical data related to the plaintiff's health status.

**75. Who:** Defendant SAMIR ABRAKSIA M.D.

**When:** June 30, 2020 at or about 1:30 p.m. xx check time

**Where:** Cleveland Clinic South Pointe 20000 Harvard Ave., Beachwood, OH 44122

**What:** Purposefully concealed (NON-DISCLOSURE) a considerable measure of critical medical information related to the plaintiff's current and past health status related to bloodwork and blood disorders. The defendant misrepresented medical information to the plaintiff and her husband. The defendant intentionally underreported and reported inaccurate medical symptoms the plaintiff explained with clarity to the physician. In addition, the defendant violated the statue, medical negligence, and violated the plaintiff's constitutional right to personal autonomy and bodily interest U.S.C.A Const. AMEND 14; 42 U.S.C.A. § 1983.

**76. How:** SAMIR ABRAKSIA M.D. intentionally and with malice deprived the plaintiff of the laboratory findings from the June 26, 2020 Cleveland Clinic South Pointe Hospital's bloodwork testing, specifically the COMPLETE BLOOD COUNT. ABRASKIA denied retrieving or evaluating the complete blood count

results and argued that the plaintiff's primary care physician did not order a complete blood count test, which was far from the truth. **SEE EXHIBIT (#28).**

77. The defendant failed to deliver honest health care. The defendant ABRASKIA was in possession and accessed the COMPLETE BLOOD COUNT TEST RESULTTS, which included the WHITE BLOOD COUNT during the office visit on June 30, 2020 at 1:30 p.m. **SEE EXHIBIT (#29a).** Although he denied having the results and alleged the absences of the results prevented him from evaluating any blood conditions related to a White Blood Count or diagnosis D70.9-NEUTROPENIA UNSPECIFIED. The visit was chiefly based upon the plaintiff's primary physician's suspicion concerning past abnormal blood results, and LOW White Blood Counts; the primary diagnosis D70.9 NEUTROPENIA Unspecified.

78. ABRASKIA did, however, contrary to the explanation he offered the plaintiff and her spouse, author, report, and documented a Diagnosis in the plaintiff's medical record and reviewed the complete blood count results during the time of the office visit on June 30, 2020 about 1;30 P.M. **SEE EXHIBIT (#29b).**

79. ABRASKIA construed an untruthful narrative of the numerous medical records the plaintiff shared with defendant from UNIVERSITY HOSPITAL

SYSTEMS LABORATORY of CLEVELAND & BEDFORD OH. The UNIVERSITY HOSPITALS LABORATORY results identified and pointedly referenced many abnormal findings that the attending physicians should be alerted and other significant notations of physician's detailing observations of abnormal results, particularly components of the complete blood count -WHITE BLOOD COUNT, and CBC Differential **SEE EXHIBIT (#30) Plaintiff's bloodwork results from UNIVERSITY HOSPITAL 1998-2018, and 2016 - CLEVELAND CLINIC'S TWINSBURG, OH.** ABRAKSIA alleged he did not know what went on in the past, but now everything looks fine with your blood."

80.  The American Medical Association, in 1980, included a reference to honesty "a physician shall deal honestly with patients and colleagues and strive to EXPOSE those physicians deficient in character or competence or who engage in fraud or deception." The defendant behaved contrary to his legal, ethical and professional standards of care.

81. The American Hospital Association's "Patient's Bill of Right" (1972) The requirement of honesty clearly linked today with the patients' NEW LEGAL right to give informed and free consent or refusal of treatment. Patient power in the doctor/patient relationship the distinguishing element of modern medical ethic."

82. During the June 30, 2020 visit ABRAKSIA committed a blatant lie by alleging he could not evaluate the plaintiff's WHITE BLOOD COUNT to the plaintiff and her husband, since "Your doctor did not order A COMPLETE BLOOD COUNT." This was far from the truth; the plaintiff obtained her medical record form MRO that demonstrated the physician was in possession of the entire bloodwork results from June 26, 2020 during the office visit and reviewed and diagnosed the plaintiff's health conditions during the visit **SEE EXHIBIT (#29 b).** According to many experts, honesty in medicine is crucial, "Lying and deception in the clinical context is just as bad as continued aggressive interventions to the end. BOTH QUALIFY AS TOTURE."

83. These egregious deceptive and purposeful acts of fraudulent concealment have harmed the plaintiff. The plaintiff has no clear or obvious path to determine or participate in her clinical decision making. The defendant's dishonesty, deception, and intentional purposeful acts of concealment and misrepresentation caused feelings of "torture," suffering mental and emotional, along with the ongoing and persistent, severe physical symptoms for the plaintiff. The plaintiff's spouse was impacted from these calllouses acts committed by this heath care provider.

The breach of care has caused a large measure of mental and emotional stress and ongoing severe physical pain.

.

84. The plaintiff sought guidance and further consultation from the defendant through the CLEVELAND CLINIC'S OMBUDSMAN OFFICE, the PRESIDENT-TOMISLAV MIHALJELVIC, and the DIVERSITY AND INCLUSION OFFICE. **SEE EXHIBIT (#31) Plaintiff's letter to the above-mentioned individuals and offices.** The physician contacted the plaintiff via phone on August 26, 2020 and admitted to his disturbing, illegal, unethical, and harmful actions. The defendant was unable to provide his motives for these NON-DISCLOSURE of medical diagnosis, omission and discontinued additional bloodwork testing on June 30, 2020 to provide COMPLETE BLOOD WORK CBC and Differential and his purposeful concealment from plaintiff. The plaintiff has alleged/provided enough facts to support an inference of scienter. The plaintiff alleges facts that rise to the level of plausibility by providing "enough facts from which malice might reasonably be inferred." Schatz v, Republican State Leadership Comm.,669F.3d 50,58 (1st Cir.2012) (log -in required).

85.  The plaintiff has plead more than general statements of fraudulent intent, which courts demand since Twombly and Iqbal. In Iqbal, the court held that a claim "has plausibility when the plaintiff pleads factual content that allows the court to draw reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Igbal,556 U.S. 662, 667-78 (2009) "while this was addressing

Rule 8 pleading, courts have applied it to 9 (b)." The defendant violated the statues and Constitutional Rights of the plaintiff for no other reason than her status under race, religious, gender, and age are protected classes xxx. Look up act.

The plaintiff re-alleges and incorporates by reference herein all the allegations contained in paragraphs 1 -85 above.

## COUNT XI – MEDICAL NEGLIENCE MALPRACTICE

86. Defendant, KRISTINA SHAFFER documented the plaintiff's most recent past provider's health care encounter inaccurately and failed to provide an objective and factual summary of the findings and treatment the plaintiff explained related to her breast consultation and images performed at MAYO CLINIC, Rochester, Minnesota on September 26 &27, 2020.

87. Defendant Kristina Shaffer had no objective rationale for the summary she authored in the plaintiff's medical report. The defendant pre-documented care on July 9, 2020 before the plaintiff's July 14, 2020 CLEVELAND CLINIC BREAST CONSULTATION and the defendant utilized numerous subjective, vague, and inaccurate statements in medical report.

87. Defendant SHAFFER, omitted and purposely manipulated medical history to promote an intentional, calculated, and untruthful IBIS RISK FACTOR CALCULATION. The RISK FACTOR ASSESSMENT "estimates the breast cancer risk based on the following risk factors: Age, Body Mass Index, Age at Menarche, Obstetric History, Age at Menopause (if applicable), History of Benign Breast Condition that increases breast cancer risk, History of Ovarian Cancer, Use of Hormone Replacement Therapy, Family History (including breast and ovarian cancer, Ashkenazi inheritance if genetic testing done.) The defendant performed multiple IBIS RISK FACTOR CALCULATIONS on July 17, 2020 **SEE EXHIBIT (#32).**

88. Defendant SHAFFER engaged in an interview with plaintiff and her spouse during the July 17, 2020 office visit where she obtained the correct information to complete the IBIS RISK FACTOR CALCULATIONS. The defendant had access to additional medical records, at hand, during the office visit, to retrieve the plaintiff's accurate risk factors to input for the IBIS RISK FACTOR CALCULATION ASSESSMENT.

89. Defendant SHAFFER, purposely failed to record and input the exact data reported verbally and written by plaintiff in patient questionnaire on July 17, 2020

for the IBIS RISK FACTOR CALCULATIONS. KRISTINA SHAFFER M.D. -
FELLOW administered and reported the results for IBIS RISK FACTOR
CALCULATION in a very reckless and irresponsible manner on July 17, 2020. The
IBIS RISK FACTOR- TYRER-CUZICK model has been established as "the most
consistently accurate." The physician administering the tool knew or should have
known the criticality of responding to the breast cancer risk based on the above-
mentioned factors completely and truthfully. The physician deliberately omitted
numerous risk factor responses, reported inaccurate risk factor responses, and she
willingly changed the plaintiff's quantifying breast density, from
HETERGENOUSLY DENSE-C to SCATTERED FIBROUS GLANDULAR to
drastically reduce and impact the results of test.

90. The plaintiff was not made aware of the newly diagnosed BREAST DENSITY
at any time during the consultation with the defendant PAULETTE TURK
(LEBDA)M.D.- RADIOLOGIST on July 17, 2020 at on or about 12:30p.m. The
defendant compared September 27, 2019 (MAYO CLINIC) and December 5, 2018
(UNIVERSITY HOSPITAL SYSTEMS BEDFORD) images and reports and she
then reported on July 17, 2020, the exams and views had not significantly changed
and correlates as an incidental finding-from MAYO CLINIC September 27, 2020
exam.  The Defendant described this same exact narrative to the plaintiff. "Nothing

has seemed to change, "and she further pointed out what she called, "I see the black hole Mayo referenced in the INCIDENTIALLY FOCUSED ULTRASOUND." (referring to the benign-appearing cyst in duct of right breast.

91.The defendant PAULETTE TURK (LEBDA) did note in the medical record "There are scattered fibro glandular elements in both breasts." The mention of the "scattered fibroglandular elements in both breasts." does not clearly distinguish that the physician had re-quantified the BREAST DENSITY from the DECEMBER 5,2018 HETGENEROUSLY DENSE **SEE EXHIBIT (#33)** or SEPTEMBER 27, 2019 HETGENEROUSLY DENSE: C **SEE EXHIBIT (#34)** to SCATTERED FIBRO GLANDULAR. The language used in the reports is ambiguous. TURK(LEBDA) deliberately authored a medical document that was unclear and difficult to determine a definite finding, but easy to detect her deliberate and undeniable course of actions to re-quantify the plaintiff's breast density without labeling the breast in a BREAST DENSITY CATEGORY as reported by the American Cancer Society (2020).

92. Defendant TURK(LEBDA) carried out this same practice throughout the reports she created of the plaintiff's

Mammogram (Diagnostic) and Limited Right Breast Ultrasound. The report issued several orders. The most glaring is what TURK (LEBDA) noted BI RAD: 0, the American Cancer Society determined, calls for additional testing BI RADS :0 "Incomplete additional imaging evaluation and or comparison to prior mammogram is needed." The defendant also ordered the plaintiff to return to annual mammogram testing despite her documenting July 17, 2020 additional imaging/testing was required.

93. The plaintiff requested further in person consultation to be clear on the information contained in the report and the appropriate course of action to follow. Additionally, the defendants provided a referral for a BIOPSY ULTRASOUND, the biopsy requisition was **NOT** for the area of concern identified from the "INCIDENTIALLY FOCUSED ULTRASOUND from September 27, 2019. The defendant PAULETTE TURK (LEBDA) amended the report and the document evolved into an unclear and slanted medical record.

94. The defendants refused and determined the plaintiff should seek medical attention at a different medical facility and arrange it by way of her primary care physician. The defendants had superior knowledge with each of the medical

encounters the plaintiff participated in. The plaintiff relied on the defendant's knowledge" and expertise.

> The Legal dictionary (n.d.) determined: Where one party exploits a position of trust and confidence or a fiduciary relationship. Fiduciary relationships include those between attorneys and clients, physicians and patients... A statement need not be affirmative to be fraudulent. When a person has a duty to speak, silence may be treated as a false statement." This can arise if a party who has knowledge of a fact fails to disclose it to another party who is justified in assuming its nonexistence."

95. Defendant SHAFFER alleged to not be involved in the re-categorization of the plaintiff's breast. But could not give a logical answer for using deceitful or omitting risk factors that promoted several misrepresented variations of IBIS RISK FACTOR CALCULATIONS. that did not provide the plaintiff with the most consistent and accurate representation of her IBIS RISK CALCULATION. Omitting and inaccurately reporting impacted the IBIS RISK CALCULATION significantly from 21% to 14.7% the manipulated and inaccurate results created a large measure of emotional and mental stress, trepidation and physical pain.

96. The IBIS RISK FACTOR -TYRER CUZICK assessment argues, "results should be a tool to help patients decide on further exploration."  Defendants SHAFFER and TURK (LEBDA) breached the standard of care by engaging in deceptive, untruthful, and purposeful misrepresentation of the plaintiff's medical care. The degree of intent is intricate, but the results are easy to notice by a simple review of the plaintiff's medical report and IBIS RISK CALCLATIONS from September 27,2020 compared to July 17, 2020. Both defendants had a fiduciary duty to the patient to provide the standard of care that aligns with national standard of care. The defendants had superior knowledge with each of the medical encounters the plaintiff participated in. The plaintiff relied on the defendant's knowledge" and expertise, particularly when administering, interpreting, and reporting the assessments/tests such as the IBIS RISK FACTOR CALCULATIONS. The defendants exploited their position of trust between the patient-plaintiff and the physicians-defendants by employing false data, omitting risk factors to achieve an orchestrated finding, and each defendant developed medical reports that were ambiguous, vague, inaccurate, and contained subjective non-factual data. The Legal dictionary (n.d.) determined:

> Where one party exploits a position of trust and confidence or a fiduciary relationship. Fiduciary relationships include those between attorneys and clients, physicians and patients... A statement need not be affirmative to be

fraudulent. When a person has a duty to speak, silence may be treated as a false statement." This can arise if a party who knowledge of a fact fails to disclose it to another party who is justified in assuming its nonexistence."

97. On July 14, 2020 1:59p.m., plaintiff- accompanied by her spouse attended appointment at CLEVELAND CLINIC SOUTH POINTE HOSPITAL, 20000 Harvard Avenue Beachwood, OH 4122 Cardiology Testing to obtain an ECHO GRAM.

98. Plaintiff requested that her spouse accompany her to the cardiology waiting area and during the test. The plaintiff's spouse could wait in a sitting area.

99. Defendant RENEE KEGLOVIC, ECHO TECHNICIAN became disturbed from the plaintiff's request to be accompanied by her spouse, which resulted in the plaintiff requesting a manager to assist in the minimal request. The Manager, TINA REESE appealed to RENEE KEGLOVIC and arranged that she would sit in FRONT of the door of the testing room-with FULL view and the plaintiff's spouse on the side wall beside the room-with NO view.

100.  Defendant KEGLOVIC became so annoyed and irritated her countenance radically changed. The plaintiff subsequently checked in with the Manager, Tina Reese to determine if the defendant was capable of containing her dissatisfaction to administer the test in a professional, courteous, and safe manner.

101. Defendant's disrespectful attitude increased as she began the test and discovered the door would remain open during the echogram. There was no dialogue between the plaintiff and defendant besides the request to be accompanied by spouse, which was conducted in a courteous and respectful manner. The defendant conducted what she represented/ alleged was an Echogram test in about or less than an hour. No medication was administered nor did the plaintiff stay at the hospital as an inpatient. There was a concern related to the plaintiff's extremely high blood pressure readings, which led to the Cardiologist Nurse contacting the plaintiff's primary care physician.

102. The Plaintiff obtained her medical record from this testing July 14, 2020. The defendant reported numerous untruths. First, she alleged the plaintiff was hostile. The plaintiff was never hostile; the technician perceived the plaintiff's request as hostile. The plaintiff simply asked for her spouse to accompany her. The defendant became irritated, annoyed, and rushed to persuade the plaintiff to begin the testing. The plaintiff insisted on speaking with manager. The defendant described and

reported the plaintiff as uncooperative. This was not true; the plaintiff made a simple request by way of defendant KEGLOVIC'S superior. The defendant subjectively perceived this as the plaintiff being uncooperative, which was a misperception and inaccurate.

103. The view of the Echo technician alleging the plaintiff's desire for her spouse, or any caregiver, or family member, or advocate to have an integral role in the plaintiff's health care is absurd for a medical professional and it is contrary of the CLEVELAND CLINIC' S own DIVERSITY and INCLUSION protocols.


104. The defendant documented untruths and very harmful words. The defendant went even further and state the plaintiff was "paranoid." All the above-mentioned language has negative psychological categorizations. The defendant erred in her subjective, non- factual, and derogatory summary of the encounter. The defendant's actions fell below the standard of care.

The defendant reported the care took place until 11:59 p.m. on July 14, 2020 and that the plaintiff was the recipient of a medication, which was documented in the plaintiff's medical report **SEE EXHIBIT (#35).** These two components of the medical were blatant lies.

105. Plaintiff denies receiving any medications and the plaintiff denies the time of hospital stay. This medical report and the actions and inactions of the defendant fall below the national standards and are extremely egregious.

106. The ECHO- technician did not represent herself as a licensed or certified mental health provider, or physician, her characterizations of the plaintiff's request were subjective and untrue statements. By such actions the defendant created a negative psychological narrative that caused intentional harm to plaintiff. Other individuals can access these inaccurate and untruthful defamatory statements from KEGLOVIC'S subjective, non-factual, derogatory, and negative psychological descriptors. The defendant is libel under the Ohio state law and Federal law for her actions and must be held accountable for these defamatory statements.

The Plaintiff re-alleges and incorporates by reference herein all the allegations contained in paragraphs 1-106 above.

**WHEREFORE:** The plaintiff claims monetary damages against CLEVELAND CLINIC, 9500 Euclid AVENUE CLEVELAND, OHIO 44195 CLEVELAND CLINIC SOUTH POINTE HOSPITAL AND CLEVELAND CLINIC LABORATORY, 20000 HARVARD AVENUE, BEACHWOOD, OHIO 44122,

SAMIR ABRAKSIA M.D., PAULETTE TURK (LEBDA) M.D., KRISTINA

SHAFFER M.D., and RENEE KEGLOVIC ECHO TECHNICIAN collectively

and individually in an amount of $1.5 million at trial, plus cost and any further

relief that this Honorable court deems necessary and appropriate to be fixed by the

jury.

We further request punitive damages in an amount, so high defendants never do

this again.

## COUNT XII: RACIAL DISCRIMINATION

107. This racial discrimination is brought pursuant to TITLE VI I of the Civil

Rights Act of 1964, as amended. The jurisdiction of this court is invoked by the

plaintiff pursuant to 28 U.S.C. ∫∫ 1331, 1343(4) and 28 U.S.C. ∫ 2201 and 2202.

This lawsuit is brought pursuant to the Civil Rights Act of 1866," 42 U.S.C. S

1981, and 1981a and the Civil Rights Act of 1964, 42 U.S.C. S 2000e et seq., as

amended by the Civil Rights Act of 1991, Equitable and other relief sought under

42 U.S.C. 200e-5 (g).

108. The plaintiff further alleges racial and gender discrimination. The plaintiff is a

58-year-old, an African American female citizen of the United States and a

resident of the state Ohio.


109. The defendants repeatedly provided healthcare to the plaintiff in a poor,

inferior, and discriminatory manner. The defendants intentional and deliberate

NON-DISCLOSURES, OMISSIONS OF ACCURATE OBJECTIVE FACTUAL

MEDICAL DATA, DEMEANING, MALICIOUS, and DISCRIMINATORY

treatment were unwarranted. The Defendants discriminatory acts, negative

performances, defamatory statements-libel, breach of standard of care, and the

defendant's refusal to allow the plaintiff to complete medical treatments were

egregious and unlawful. The defendants all except public funding "any program

receiving federal funds must treat the protected classes fairly.

110. CLEVELAND CLINIC 9500 Euclid AVE., CLEVELAND OHIO 44195,

CLEVELAND CLINIC LABORATORY 20000 HARVARD AVE.,

BEACHWOOD, OHIO 4122, SAMIR ABRASKIA, PAULETTE TURK

(LEBDA), KRISTINIA SHAFFER, and RENEE KEGLOVIC are liable under

TITLE VII for their discriminatory acts they subjected the plaintiff to. They knew

or should have been aware of their racial discrimination and harassment especially

after the plaintiff specifically pointed out the health inequities the Black, females,

and minority individuals are challenged by within the healthcare system. The defendants did just the opposite they acted discriminatory, maliciously, deliberately, and cruelly manipulated their position of power and expertise over the 58-year-old, female African American. "Exploitations of blacks in medical history, but the potential for exploitation of any population that may be vulnerable because of race, ethnicity, gender, disability, age, or social class…"  The defendant's misconduct, racist discriminatory behaviors, non-treatment, and denial of treatment are well-established factors that took place during the plaintiff's health care consultations, testing, reports, treatments, medical records, and correspondence with Ombudsman Office whom reiterated "seek treatment elsewhere by way of your primary care physician."

111. The plaintiff was subjected to pre-planned devise measures by the defendant, PAULETTE TURK (LEBDA) to recreate the plaintiff's medical narrative at the onset of her appointment with the defendants. They purported an untruthful narrative related to the reports and images she brought to appointment- saying they were from a hospital she never had testing at in AKRON, OHIO. The defendants utilized this untruth to persuade plaintiff to participate in additional Breast Mammogram Imaging and a Limited Right Ultrasound. TURK (LEBDA) produced an ambiguous, vague, and misleading report to represent a re-

quantification of plaintiff's Breast Density, which she did not clearly state as such. She depicted a lesser category "SCATTERED AREAS OF DENSEDGLANDDULAR FIBROUS TISSUE", although did not change the category from HETERGENEROUSLY DENSE, as stated in the University Hospital report **SEE EXHIBIT (#33)** that she alleged was the same as her finding which was untrue and incorrect. The defendant failed to make plaintiff aware of her significant finding. Defendant SHAFFER continued these acts by implementing the newly slanted report BREAST DENSITY for her calculations in a critical assessment, the IBIS RISK CALCULATOR. Additionally, she omitted the plaintiff's medical data she was aware of and had access to intentionally. These deliberated actions by the defendants resulted in lowered IBIS RISK calculation and promoted an overall reduction of the plaintiff's breast health symptoms and status.

112. The physician behaved contrary to their ethical, professional duty, and breached the standard of care. The defendants are required to report the truth and deficiencies of other physicians-colleagues. The plaintiff communicated on July 17, 2020 to the defendants at the beginning of the CLEVELAND CLINIC'S BREAST CONSULTATION visit the MAYO CLINIC'S NON -DISCLOSURE of the "INCIDENTIALLY FOCUSED ULTRASOUND 4mm BENIGN

APPEARING CYST…" The Defendants TURK(LEBDA) and SHAFFER denied having the plaintiff's reports/cd and maneuvered the plaintiff's medical data intentionally to create a less serious medical narrative that was not based on the plaintiff's objective medical data available and reported to them. The defendants acted recklessly and generated a medical narrative that protected the defendants at Mayo Clinic by drastically reducing the status of the plaintiff's breast health and provided the plaintiff inferior, poor, untruthful, malicious, hostile, deceptive and discriminatory health care violating the plaintiff's rights due her under TITLE VII.

113. Defendant KEGLOVIC'S medical report revolved heavily on psychogenic descriptors and further violated the plaintiff's civil rights based on gender and racial discriminatory acts. U.S. Code Title 42, Chapter 21 - Civil Rights Title 42, Chapter 21 of the U.S. Code prohibits discrimination against persons based on gender, age, disability, race, national origin, and religion (among other things) in a number of settings including: education, employment, access to businesses and buildings, federal services, and more.

114. According to Dr. Frances, chair of the task force on the 4th Edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM), in the Columbia Journal of Gender and Law, reported he,

was rightfully concerned about medical professionals utilizing psychogenic

illness as an explanation for patient's symptoms, ESPECIALLY WOMEN

and warned could lead to misdiagnoses. He furthered elaborated

"Psychogenic explanations have been called the "wastepaper basket of

medicine because they are easy to use, they lack an objective test, and they

are the only mental health diagnoses based not on symptomology but rather

speculation about cause."

The defendant KEGLOVIC was guilty of this, she speculated the plaintiff's request

to be accompanied by her husband to be motivated from several psychogenic

descriptors she reported "paranoid, hostile, uncooperative", which were untrue.

DR. Allen Frances further argued,

Even more concerning is how quickly healthcare professionals can jump to

diagnoses, in one study that was as quickly as THIRTY SECONDS to TWO

MINUTES into an interaction with a patient, depending on whether the

physician felt CONFUSED, IRRITATED at the patient. or felt that the

interaction with the patient was negative These psychogenic diagnoses

become very "sticky:" They shatter the credibility of a patient among other

physicians because their medical file now says their symptoms are

psychogenic.

The defendants KEGLOVIC and SHAFFER knew or should have known the consequences of psychologizing the plaintiff's request or the plaintiff's factual description of her past medical encounters. The defendants' immediate inaccurate, speculative, and psychogenic explanations have placed the plaintiff in a vulnerable position; the messaging that the plaintiff's actions were psychological impacted her negatively and will do so especially since the are incorporated in the plaintiff's medical record. The Columbia Journal of Gender and Law, stated,

> women patients as a group are left vulnerable to misdiagnosis, under-
> diagnosis, and being likely stereotyped as mentally ill making them less
> likely to ever receive a correct diagnosis Women patients are thus more
> likely to experience missed, delayed, or wrongful diagnoses, which are
> legally redressable claims under medical malpractice.

The plaintiff is making this claim of action for gender-based discrimination the defendants' gender- based and racial discriminatory acts resulted in managers and administrators failing to take prompt and effective remedial action. Their response was to deny plaintiff any further care.

115. The defendants initial conduct fostered dishonest, hostile, and racial discriminatory behaviors. The abuse followed in each subsequent encounter. The discriminatory acts were open, harsh, hostile, and without shame.  During one

important phone call, on August 27, 2020 the Defendant ABRAKSIA told the plaintiff if she "said another word he would hang up the phone, be quiet lady" the plaintiff was questioning his reason for his blatant lies related to the CBC test and the diagnoses he provided. The defendant admitted he was untruthful and characterized the lies as, "I miscommunicated." When the plaintiff addressed or questioned the defendants in any minimal dialogue the defendants threatened, disputed, documented untruthful, defamatory, and negative psychological descriptors, reprimanded, and eventually refused treatment to the 58-year-old African -American, female, and MEDICARE recipient. There was no other reason than the plaintiff's race, gender and SES status identifiable from the plaintiff being a recipient of the Federal Medicare Program. The plaintiff was held to strict scrutiny by the defendants who were all licensed medical providers and had a fiduciary duty to the plaintiff the patient. The defendants failed at each step and the administrators failed to act or ratify these malicious, hostile, defamatory, and racial discriminatory acts that are a violation under TITLE VII, U.S. Code Title 42, Chapter 21 - Civil Rights Title 42, Chapter 21 of the U.S. Code prohibits discrimination against persons based on gender, age, disability, race, national origin, and religion (among other things) in a number of settings including: education, employment, access to businesses and buildings, federal services, and more.

The Plaintiff re-alleges and incorporates by reference herein all the allegations contained in paragraphs 1-115 above.

**WHEREFORE:** The plaintiff claims monetary damages against CLEVELAND CLINIC, 9500 Euclid AVENUE CLEVELAND, OHIO 44195 CLEVELAND CLINIC SOUTH POINTE HOSPITAL AND CLEVELAND CLINIC LABORATORY, 20000 HARVARD AVENUE, BEACHWOOD, OHIO 44122, SAMIR ABRAKSIA M.D., PAULETTE TURK (LEBDA) M.D., KRISTINA SHAFFER M.D., and RENEE KEGLOVIC ECHO TECHNICIAN collectively and individually in an amount of $1.5 million at trial, plus cost and any further relief that this Honorable court deems necessary and appropriate to be fixed by the jury.

We further request punitive damages in an amount, so high defendants never do this again.

The plaintiff has provided detail on the altercations that caused her injury's and harm. The plaintiff has provided a timeline of events leading up to the injury and describes them with specific symptoms and critical signs. The defendants' hostile, egregious, deceptive, medical negligence, medical malpractice, injuries, harms,

racial and gender discriminatory acts have been overwhelmingly demonstrated. Ashcroft v. Iqbal, 556 U.S, 662, 678, 129 S. Ct. 1937, 173 L. Ed.2d 868 (2009) quoting Bell Atl. Corp. v Twombly. Bell Atl Corp. v. Twombly 550 US 544, 555,127, S. Ct.1955, 167 L. Ed.2d 929 (2007) complaint must allege sufficient facts to state that is plausible on its face. Together, Twombly and Iqbal "determined" [ ] the sufficiency of a complaint" under Rule 8, which governs pleading standard in all civil actions and proceedings in the United States district courts[,] … antitrust and discrimination suits alike."  The plaintiff has provided facts to state the claim is plausible on its face. Moreover, "a claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. "Rule 8 of the Federal Rules of Civil Procedures governs pleadings in federal courts. The Supreme Court has stated that a plaintiff need only allege "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Salvatore LARCA v. United States of America, et al No 4:13 cv-205* The District Court, Sara Lioi, J., held Ohio rule requiring affidavit of merit to be filed with pleadings involving medical claims conflicted with FEDERAL RULES of CIVIL PROCEDURE; and FEDERAL RULES of CIVIL PROCEDURE APPLIED. Where a FEDERAL RULE of Civil Procedure provides a resolution of an issue, that rule must be applied by a FEDERAL COURT sitting in diversity to

the exclusion of a conflicting state rule so long as the federal rule is authorized by the Rules enabling Act and consistent with the Constitution. *" Chamberlain v. Giampapa, 210 F .3d 154,159 (3d Cir.2000). Gallivan v. United States of America No. 18-3874* Holdings The Court of Appeals, Thapar, Circuit Judge held that: federal rules of procedure, not state rules, applied in action; federal rules of civil procedure did not require filing of affidavit to support FTCA claim for medical negligence; The  federal rule of civil procedure governing motions to dismiss for failure to state claim does not demand evidentiary support, in an affidavit or any other form, for claim to be plausible. Fed.R.Civ.P.12(b)(6). Even without an affidavit, a complaint can survive a motion to dismiss for failure to state a claim and move beyond the pleading stage into discovery. Fed.R.Civ.P.12(b)(6). Pursuant to the Supremacy Clause, federal law if valid, displaces inconsistent state law. U.S. Const. art. 6, cl.2. The federal rules of civil procedure have the same status as any other federal law under the Supremacy Clause. U.S. Const. art. 6, cl. 2.

The plaintiff has pleaded above and beyond notice pleading standard required by federal rules requiring liberal notice pleading standard by pro se. The plaintiff's complaint is not probable but plausible and able to withstand rule 8 motion for dismissal.

## JURY DEMAND

WHEREFORE: The Plaintiff claims monetary damages against Defendants

JOSEPH SHAWI, M.D., J. BOYD, M.D., DANIEL RZEPKA, M.D., these

defendants were employed by UNIVERSITY HOSPITALS OF CLEVELAND

INC.OH, 11100 Euclid Avenue Cleveland, OH 44106, UNIVERSITY HOSPITAL

MACDONALD WOMEN'S HOSPITAL, INC., 8900 Darrow Road Suite H112

Twinsburg, OH, 44087 in an amount to be determined at trial, plus costs, and for

any further relief that this Honorable Court  and jury deems necessary and

appropriate. Respectfully submitted,

s/ Alycia A. Taylor, Pro se

Alycia A. Taylor

240 Eaton Ridge #103

Sagamore Hills, Ohio 44067

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing complaint was

filed at the Clerk's office in THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO on _____ and was sent

UNIVERSITY HOSPITALS OF CLEVELAND INC.OH, 11100 Euclid Avenue

Cleveland, OH 44106, UNIVERSITY HOSPITAL MACDONALD WOMEN'S

HOSPITAL, INC., 8900 Darrow Road Suite H112 Twinsburg, OH, 44087,

JOSEPH SHAWI, M.D., J. BOYD, M.D., DANIEL RZEPKA, M.D., capacity,

individual capacity UNIVERSITY HOSPITAL HEALTH SYSTEM, BEDFORD

MEDICAL CENTER, INC., BEDFORD, OH 44146

to the following by certified mail and or Marshall service:  Respectfully submitted,

s /Alycia A. Taylor pro
se
240 Eaton Ridge #103
Sagamore Hills, Ohio 44067
(216)630-2653

Ablessing61@yahoo.com